

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-9-2003

# In Re: United Artist

Precedential or Non-Precedential: Precedential

Docket 01-1351

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"In Re: United Artist " (2003). *2003 Decisions.* Paper 823.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/823

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 9, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1351

IN RE: UNITED ARTISTS THEATRE COMPANY, et al.,

Debtors

v.

*DONALD F. WALTON, Acting United States Trustee
for Region 3

*Donald F. Walton,

Appellant

*(Substituted Pursuant to F.R.A.P. 43(c))

Appeal from the United States District Court
for the District of Delaware
(Del. Bankr. No. 00-03514)
District Judge: Honorable Sue L. Robinson

Argued: December 4, 2001

Before: ALITO, RENDELL, and AMBRO, Circuit Judges

(Opinion Filed: January 9, 2003)

James H.M. Sprayregen
James W. Kapp, III (Argued)
David J. Zott
Kirkland & Ellis
200 East Randolph Drive
Suite 6500
Chicago, IL 60601

Counsel for Appellee
United Artists Theatre Company,
et al.

Richard A. Chesley (Argued)
Houlihan Lokey Howard & Zukin
123 North Wacker Drive
4th Floor
Chicago, IL 60606

Counsel for Appellee
Houlihan Lokey Howard & Zukin

Bruce G. Forrest (Argued)

United States Department of Justice
Civil Division, Appellate Staff
601 D Street, N.W.
Washington, DC 20530

Counsel for Appellant
Acting United States Trustee

OPINION OF THE COURT

AMBRO, Circuit Judge:

The United States Trustee (the "U.S. Trustee") 1 appeals
the District Court of Delaware's approval of a bankruptcy
debtor's application to retain a financial advisor.
Specifically, the U.S. Trustee objects to the debtor's
agreement to indemnify the financial advisor for claims of
negligence (as opposed to gross negligence) that may be

_____

1. Patricia A. Staiano was the U.S. Trustee at the time of briefing, but
her term expired on October 5, 2001. Her current replacement is Acting
U.S. Trustee Donald F. Walton.

2

leveled against it. We first address whether the U.S. Trustee
has standing to bring this suit, and determine that he does.
Next we examine whether subsequent confirmation of the
reorganization plan renders this case constitutionally or
equitably moot. After concluding that it is not moot in
either sense, we turn to the merits of the U.S. Trustee's
appeal. We affirm the District Court's ruling that the
indemnification provision is permissible, though we do so in
a way that eschews the inherent imprecision between
shades of negligence. In so doing, we borrow from corporate
law analogues, and focus on the process by which financial
advisors reach their opinions rather than on the substance
of the opinions themselves.

I. Background

United Artists Theatre Company and affiliates2
(collectively, the "Debtors" or "United Artists") filed for
Chapter 11 bankruptcy protection in the District Court.3 At
the outset the Debtors requested court approval of their
retention of Houlihan, Lokey, Howard & Zukin Capital
("Houlihan Lokey") as financial advisor. The engagement
letter provided that United Artists would indemnify

_____

2. These affiliates are United Artists Theatre Circuit, Inc., United Artists
Realty Company, United Artists Properties I Corp., United Artists
Properties II Corp., UAB, Inc., UAB II, Inc., Mamaroneck Playhouse
Holding Corporation, Tallthe Inc., UA Theatre Amusements, Inc., UA
International Property Holding, Inc., UA Property Holding II, Inc., United
Artists International Management Company, Beth Page Theatre Co., Inc.,
United Film Distribution Company of South America, U.A.P.R., Inc., R
and S Theatres, Inc., and King Reavis Amusement Company.

3. The District Court of Delaware's relationship with the United States Bankruptcy Court for the District of Delaware has a checkered past. The District Court revoked the automatic reference of bankruptcy cases to the Bankruptcy Court effective February 3, 1997. In December of 2000, the District Court reinstated the automatic referral, and then revoked it once more in April of 2001. An order dated September 6, 2001 again reinstated the automatic reference. Revoking the automatic reference means in practical terms that bankruptcy cases are assigned to the District Court unless, on a case-by-case basis, they are referred to the Bankruptcy Court. The District Court retained this case, which was filed while the reference revocation was in effect.

3

Houlihan Lokey's reasonable attorneys' fees and expenses, as well as any losses incurred by Houlihan Lokey with respect to, inter alia, its providing of services. The letter also contained an exception for "any Losses that are finally judicially determined to have resulted from the gross negligence, bad faith, willful misfeasance, or reckless disregard of its obligations or duties on the part of Houlihan Lokey."4

_____

4. The principal indemnity provisions of the retention agreement are as follows:

(a) If Houlihan Lokey or any employee, agent, officer, director, attorney, shareholder or any person who controls Houlihan Lokey (any or all of the foregoing, hereinafter an"Indemnified Person") becomes involved in any capacity in any legal or administrative action, suit, proceeding, investigation or inquiry, regardless of the legal theory or the allegations made in connection therewith, directly or indirectly in connection with, arising out of, based upon, or in any way related to (i) the Agreement; (ii) the services that are the subject of the Agreement; (iii) any document or information, whether verbal or written, referred to herein or supplied to Houlihan Lokey; (iv) the breach of the representations, warranties or covenants by the Company given pursuant hereto; (v) Houlihan Lokey's involvement in the Transaction or any part thereof; (vi) any filings made by or on behalf of any party with any governmental agency in connection with the Transaction; (vii) the Transaction; or (viii) proceedings by or on behalf of any creditors or equity holders of the Company, the Company will on demand, advance or pay promptly, on behalf of each Indemnified Person, reasonable attorneys' fees and other expenses and disbursements (including, but not limited to, the cost of any investigation and related preparation) as they are incurred by the Indemnified Person. The Company also indemnifies and holds harmless each Indemnified Person against any and all losses, claims, damages, liabilities, costs and expenses (including, but not limited to, attorneys' fees, disbursements and court costs, and costs of investigation and preparation) ("Losses") to which such Indemnified Person may become subject in connection with any such matter.

(b) If for any reason the foregoing indemnification is determined to

be unavailable to any Indemnified Person or insufficient fully to
indemnify any such person, then the Company will contribute
to the amount paid or payable by such person as a result of

4

The U.S. Trustee objected, claiming, inter alia , that the
retention agreement exempted Houlihan Lokey from liability

---

any such Losses in such proportion as is appropriate to reflect
(i) the relationship between Houlihan Lokey's fee on the one
hand and the aggregate value of the Transaction on the other
hand or (ii) if the allocation provided by clause (i) is not
permitted by applicable law, not only such relative benefit but
also the relative fault of the other participants in the
Transaction, on the one hand, and Houlihan Lokey and the
Indemnified Persons on the other hand, and any other relevant
equitable considerations in connection with the matters as to
which such Losses relate; provided, however, that in no event
shall the amount to be contributed by all Indemnified Persons
in the aggregate exceed the amount of the fees actually received
by Houlihan Lokey hereunder.

(c) Any Indemnified Person shall have the right to employ such
person's own separate counsel in any such action, at the
Company's expense, and such counsel shall have the right to
have charge of such matters for such person.

(d) The indemnification obligations hereunder shall not apply to
any Losses that are finally judicially determined to have
resulted from the gross negligence, bad faith, willful
misfeasance, or reckless disregard of its obligations or duties on
the part of Houlihan Lokey or such Indemnified Person. In the
event of such final judicial determination, the Company shall,
subject to Houlihan Lokey's rights of contribution, be entitled to
recover from the Indemnified Person or Houlihan Lokey the
costs and expenses paid on behalf of such Indemnified Person
pursuant to this indemnification obligation.

In addition, United Artists' application to retain Houlihan Lokey
supplemented the gross negligence and willful misconduct carveouts for
indemnity in subparagraph (d) above by providing that, in the case of a
judicial determination, it must be final and find that either the gross
negligence or willful misconduct is "solely" the cause of any claim or
expense of Houlihan Lokey. The order approving the application contains
the same language.

The application and order also provide indemnity to Houlihan Lokey
for its "prepetition performance of services." The U.S. Trustee, however,
appeals only whether "indemnification provisions, holding a financial
advisor harmless for the consequences of its negligence in connection
with services it provides to the debtors in a bankruptcy proceeding," are
reasonable under 11 U.S.C. S 328(a)(emphasis added).

5

for its own negligence, thus violating the Bankruptcy Code,

public policy, and basic tenets of professionalism. Specifically, it argued that the agreement was unreasonable under two provisions of the Bankruptcy Code, 11 U.S.C. SS 327(a) and 328(a), because allowing a debtor's estate to indemnify a financial advisor for its own negligence undermines the principal purpose of bankruptcy -- conserving the debtor's assets in order to pay its creditors. The District Court, rejecting the U.S. Trustee's objections, approved the Debtors' retention of Houlihan Lokey in a memorandum order dated December 1, 2000 (though not entered on the docket until December 8, 2000). The Debtors' cases then proceeded as "prenegotiated" bankruptcies.5 The confirmation hearing for the Debtors' second amended joint plan of reorganization ("the Plan") was held on January 22, 2001. The District Court confirmed the Plan that day (though the order was not docketed until January 25, 2001). On February 5, 2001, the U.S. Trustee filed this appeal.

At the time of Plan confirmation the U.S. Trustee did not object to several provisions releasing Houlihan Lokey from liability. Article X(B) provided:

_____

5. "Prenegotiated" bankruptcies have plans of reorganization and disclosure statements filed shortly after the cases themselves file, usually before the committee of unsecured creditors is formed. In re Pioneer Fin. Corp., 246 B.R. 626, 630 (Bankr. D. Nev. 2000); see also Report of the Del. State Bar Ass'n to the Nat'l Bankr. Rev. Comm'n in Support of Maintaining Existing Venue Choices 18 n.39 (October 3, 1996). This contrasts with typical Chapter 11 cases, where a plan and disclosure statement are filed many months (sometimes years) after the cases are filed, and "prepackaged bankruptcies" (or "prepacks"), where the plan and disclosure statement are filed, and sufficient favorable votes on the plan are solicited and obtained, before the Chapter 11 case begins, leading to a prompt plan confirmation. See generally Marcia L. Goldstein et al., Prepackaged Chapter 11 Case Considerations and Techniques, in 1 Weil, Gotshal & Manges, LLP, Reorganizing Failing Businesses ch. 12 (Marvin E. Jacob & Sharon Youdelman eds. 1998); Alesia Ranney-Marinelli, Prepackaged Plans of Reorganization, in A Practical Guide to Out-Of-Court Restructurings and Prepackaged Plans of Reorganization S 4.01[A], at 4-9 (Nicholas P. Saggese & Alesia Ranney-Marinelli eds., 2d ed. 2000).

6

> [O]n and after the Effective Date, each of the Debtors, the Reorganized Debtors, their subsidiaries, their affiliates, and the Releasees, and the agents, officers, directors, partners, members, professionals, and agents of the foregoing (and the officers, directors, partners, members, professionals, and agents of each thereof), for good and valuable consideration . . . shall automatically be deemed to have released each other unconditionally and forever from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or

unforeseen, existing or hereafter arising, in law, equity
or otherwise, that any of the foregoing entities would
have been legally entitled to assert (in their own right,
whether individually or collectively, or on behalf of any
Holder of any Claim or Equity Interest or other Person
or Entity), based in whole or in part upon any act or
omission, transaction, agreement, event or other
occurrence taking place on or before the Effective Date,
relating in any way to the Debtors, the Reorganized
Debtors, the Chapter 11 Cases, the Plan, the
Disclosure Statement, or any related agreements,
instruments or other documents . . . .

Article X(C) read as follows:

On and after the Effective Date, each Holder of a Claim
who has accepted the Plan, in exchange for, among
other things, a distribution under the Plan, shall be
deemed to have released unconditionally each of the
Debtors, the Reorganized Debtors . . . and the agents,
officers, directors, partners, members, professionals,
and agents of the foregoing (and the officers, directors,
partners, members, professionals, and agents of each
thereof), from any and all Claims, obligations, rights,
suits, damages, Causes of Action, remedies and
liabilities whatsoever, whether liquidated or
unliquidated, fixed or contingent, matured or
unmatured, known or unknown, foreseen or
unforeseen, existing or hereafter arising, in law, equity
or otherwise . . . .

7

Finally, Article X(E) provided:

The Debtors, . . . their members and Professionals
(acting in such capacity) shall neither have nor incur
any liability to any Person or Entity for any act taken
or omitted to be taken in connection with or related to
the formulation, preparation, dissemination,
implementation, administration, Confirmation or
Consummation of the Plan, the Disclosure Statement
or any contract, instrument, release or other agreement
or document created or entered into in connection with
the Plan . . . or any other act taken or omitted to be
taken in connection with the Chapter 11 Cases;
provided, however, that the foregoing provisions of
[this] Article X.E . . . shall have no effect on the liability
of any Person or Entity that results from any such act
or omission that is determined in a Final Order to have
constituted gross negligence or willful misconduct.

We have jurisdiction pursuant to 28 U.S.C. S 1291
because the District Court's approval of a professional's
retention is a final order. We review the District Court's
approval under SS 327(a) and 328(a) of the Bankruptcy
Code for abuse of discretion, but review its legal
determinations de novo. In re PWS Holding Corp., 228 F.3d
224, 235 (3d Cir. 2000).

II. Standing and Mootness

A. Standing

While Houlihan Lokey couches its argument solely in terms of mootness, reading closely we find a separate component of its argument: standing. It contends that a suit against it "could only be brought by someone proximately harmed by Houlihan's negligence in performing these services, i.e., an actual or potential financial stakeholder of the UA Debtors." Appellee's Br. at 6. By virtue of the releases it obtained, it reasons, no such stakeholder can sue. Because the U.S. Trustee's appeal relies upon these potential claims, Houlihan Lokey therefore argues that the U.S. Trustee lacks standing. Houlihan Lokey also questions the U.S. Trustee's standing more obliquely, observing that "[i]ndeed, it is of more than

passing interest that the party threatening to now disrupt this confirmed and effective plan is one with no such economic stake." Appellee's Br. at 12.

Contrary to Houlihan Lokey's claim, the U.S. Trustee "may raise and may appear and be heard on any issue in any case or proceeding." 11 U.S.C. S 307. A lack of pecuniary interest in the outcome of a bankruptcy proceeding does not deny the U.S. Trustee standing. See In re Columbia Gas Sys. Inc., 33 F.3d 294, 295-96 (3d Cir. 1994). U.S. Trustees are officers of the Department of Justice who protect the public interest by aiding bankruptcy judges in monitoring certain aspects of bankruptcy proceedings. Id.; accord In re Revco Drug Stores, Inc., 898 F.2d 498, 499-500 (6th Cir. 1990). Thus, we find that the U.S. Trustee has standing to challenge the indemnification provision,6 and turn to the issue of mootness.

B. Mootness

Houlihan Lokey argues that the case is both constitutionally and equitably moot. The first issue is a question of constitutional significance because, if a case is moot, we lack the power to hear it. Equitable mootness is a more limited inquiry into whether, though we have the power to hear a case, the equities weigh against upsetting a bankruptcy plan that has already been confirmed. We address each issue in turn.

1. Constitutional Mootness

The United States Supreme Court sets a high threshold for judging a case moot. An appeal is moot in the constitutional sense only if events have taken place that make it "impossible for the court to grant any effectual relief whatever." Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (citation omitted). An appeal

is not moot "merely because a court cannot restore the parties to the status quo ante [the state in which it was

9

6. We note that in In re Metricom, Inc., 275 B.R. 364, 368 (Bankr. N.D. Cal. 2002), Houlihan Lokey implicitly acknowledged the U.S. Trustee's standing to object by responding to its objections with proposed modifications.

before]. Rather, when a court can fashion some form of meaningful relief, even if it only partially redresses the grievances of the prevailing party, the appeal is not moot." In re Continental Airlines, 91 F.3d 553, 558 (3d Cir. 1996) (en banc) ("Continental I") (citations and quotation marks omitted).

Houlihan Lokey asserts that this case is moot because Articles X(B), X(C), and X(E) of the confirmed Plan contain releases that preclude potential negligence claims against it. The U.S. Trustee counters that meaningful relief may still be obtained because the retention order may be vacated, at least as to the indemnification provision. With respect to Houlihan Lokey's Article X(C) argument, 7 that Article by its own terms subjects Houlihan Lokey to potential suits. Because Article X(C) releases the Debtors and their professionals from suits by "each Holder of a Claim who has accepted the Plan" (emphasis added), it does not bind all holders of claims. Rather, it covers only those who accept the Plan. Houlihan Lokey is correct that the "UA Plan was accepted by each impaired class that was entitled to vote," Appellee's Br. at 8 n.2, but its point that each class is bound (regardless whether a member objected) misses the mark, even for those objecting who receive distributions under the Plan. If a class member accepts distributions because it is bound by the cram down provisions of S 1129(b)(1) of the Bankruptcy Code (i.e., a procedure for nonconsensual confirmation of a plan of reorganization), but it has not itself accepted the Plan, Article X(C)'s release does not apply to it. Thirty-four unsecured creditors voted to reject the Plan, and thus are unaffected by the release. Because by its own terms the release allows future claims, and in any event we can provide relief by modifying the retention order, Article X(C) does not render this case constitutionally moot.

7. We do not focus on Article X(B), which contains a mutual release of all claims among the Debtors, their affiliates, and the Releasees (defined to include "the D&O Releasees, the Prepetition Lender Releasees, the Placement Agent Releasees, Stonington, the Subordinated Note Releasees, and the Equity Releasees") because it does not affect all creditor constituencies.

10

Next, Houlihan Lokey argues that Article X(E) of the Plan

moots the U.S. Trustee's challenge because it excepts from liability (with a carveout for gross negligence and willful misconduct) "[t]he Debtors . . . and their . . . Professionals (acting in such capacity) . . . for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan . . . or . . . the Chapter 11 Cases." It applies to Houlihan Lokey, albeit only when acting in a "professional" capacity.8

Even on its own terms, Article X(E) contains carveouts (i.e., no forbearance from or tolerance of liability caused by willful misconduct or gross negligence). The question in the appeal comes full circle: can as a matter of public policy a professional be exempt from its own negligence. The answer depends on how we treat nonconsensual releases of nondebtors.

Debtors and their professionals cannot exempt themselves from liability to non-consenting parties merely by saying the word. The "hallmarks of permissible non-consensual releases" are "fairness, necessity to the reorganization, and specific factual findings to support these conclusions." In re Continental Airlines, 203 F.3d 203, 214 (3d Cir. 2000) ("Continental II"). Added to these requirements is that the releases "were given in exchange for fair consideration." Id. at 215. As in Continental II, here no finding in the confirmation order specifically addressed the releases at issue.9 Id.  Releases unbacked by adequate findings of fairness, necessity to reorganization and reasonable consideration cannot moot a challenge to the retention agreement's indemnity. What may not be valid (releases lacking the findings Continental II  requires) ipso

_____

8. Thus Houlihan Lokey is not a "professional" when it is acting in its own interest, e.g., buying and selling claims.

9. The order confirming the Plan does provide, interestingly under "Conclusions of Law," that the "releases . . . set forth in the Plan . . . shall be, and hereby are, approved as fair, equitable, reasonable and in the best interests of the Debtors . . . and their . . . Creditors . . . ."

facto cannot moot an indemnity agreement whose order approving it was not final until after confirmation. 10

While the merits of this appeal would have been singularly focused had the U.S. Trustee objected to the pertinent release provisions at confirmation, the bottom line is that the U.S. Trustee did object (and strenuously) to the scope of the indemnity demanded by Houlihan Lokey. Potential claimants still exist. Reforming the indemnity provision would accord them meaningful relief. Therefore this case is not constitutionally moot.

2. Equitable Mootness

We next examine equitable mootness. In this analysis, emphasis is decidedly on the first term of the phrase -- whether the requested relief is equitable. "The use of the word 'mootness' as a shortcut for a court's decision that the

_____

10. It could be argued that in In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir. 2000), we found an analogous release to be permissible under S 524(e). However, PWS's holding makes clear that it was not addressing a release that "affect[s] the liability of third [i.e., non-debtor] parties," id. at 247, and thus "is outside the scope of S 524(e)." Id. In discussing Continental II, the PWS panel noted that "[w]e did not treat S 524(e) as a per se rule barring any provision in a reorganization plan limiting the liability of third parties." Id. Rather, "it was clear under any rule that the court might adopt that the [third party] releases at issue were impermissible because 'the hallmarks of permissible non-consensual releases--fairness, necessity to the reorganization, and specific factual findings to support these conclusions--are all absent here.' " Id. (quoting Continental II, 203 F.3d at 214).

More to the point, PWS did address the standard of liability for creditor committee members under S 1103(c) of the Bankruptcy Code, holding that this provision "limits liability of a committee to willful misconduct or ultra vires acts." PWS, 228 F.3d at 246. While it is unclear whether the Court meant to include professionals to committees as well (the very next sentence refers to "the entities that provided services to the Committee in the event that they were sued for their participation in the reorganization," id. at 246-47) and whether the rubric "ultra vires acts" is intended to cover any form of negligence, in no event does PWS cover more than immunity from liability under S 1103(c). The level of indemnity of professionals a debtor employs underS 327 is what is at issue in this case. Therefore, we cannot hold that the release moots an issue we have not yet examined.

12

fait accompli of a plan confirmation should preclude further judicial proceedings has led to unfortunate confusion." Continental I, 91 F.3d at 559. "[T]here is a big difference between inability to alter the outcome (real mootness) and unwillingness to alter the outcome ('equitable mootness'). Using one word for two different concepts breeds confusion." Id. (quoting In re UNR Indus., Inc., 20 F.3d 766, 769 (7th Cir. 1994))(emphases in original). Here we have the power to alter the outcome because the case is not constitutionally moot, but we must balance the equities of both positions and determine whether it is prudent to upset the Plan at this date. We consider five factors

> in determining whether it would be equitable or prudential to reach the merits of a bankruptcy appeal . . . [:] (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

Continental I, 91 F.3d at 560. In Continental I, we recognized that reversing a plan's confirmation might "knock the props out from under" "intricate and involved transactions," the consummation of which is relied on by the marketplace. Id. at 561 (quoting In re Roberts Farms, Inc., 652 F.2d 793, 797 (9th Cir. 1981)).

In In re PWS Holding Corp., we rejected an equitable mootness claim in a case involving, as already noted supra n.10, a challenge to aspects of releases of liability of creditor committees and possibly their professionals. 228 F.3d 224, 236-37 (3d Cir. 2000). There we observed that "[t]he plan has been substantially consummated, but . . . [it] could go forward even if the releases were struck." Id. at 236-37. We therefore declined to dismiss on equitable mootness grounds.

The relief the U.S. Trustee seeks here does not entail "knocking [out] the props" under the Plan. He only requests that the provision indemnifying Houlihan Lokey for negligent conduct be stricken from its retention agreement.

If we were to modify the indemnity provision, the Plan otherwise would survive intact.

The remaining factors do not persuasively challenge this result. The fact that the U.S. Trustee did not obtain a stay weighs against it, but because the remedy it seeks does not undermine the Plan's foundation, this omission is not fatal. Moreover, allowing a challenge on public policy grounds to an indemnity provision is itself sound public policy. In this context, there is no equity in mooting the U.S. Trustee's challenge to the indemnity provision sought by Houlihan Lokey.

III. Permissibility of Debtors' Indemnifying Financial Advisors for Their Own Negligence

Having concluded that the U.S. Trustee has standing to bring this appeal and that the issue is not moot, we turn to whether the indemnification provision was permissible. This is an issue of first impression for this Court. 11 Section 328(a) of the Bankruptcy Code requires that the terms and conditions of employment of any professionals engaged under S 327 be "reasonable." 11 U.S.C.S 328(a). The question we therefore ask is whether it is reasonable for the Debtors to indemnify Houlihan Lokey despite its own negligence (but not gross negligence).

Both parties make plausible points on the issue. The U.S. Trustee argues that allowing professionals to obtain indemnity for their own negligence encourages a standard both lax and "inconsistent with the financial advisor's fiduciary obligations to the creditors." Appellant's Br. at 24. Houlihan Lokey worries that the courts might "Monday-morning quarterback," or second-guess, decisions that in hindsight were clearly mistaken, but at the time seemed

attractive options. Financial advisors would then be

_____

11. A bankruptcy appellate panel of the Eighth Circuit, Unsecured Creditors Committee. v. Pelofsky (In re Thermadyne Holdings Corp.), 283 B.R. 749 (B.A.P. 8th Cir. 2002), considered whether Houlihan Lokey, the financial advisor to a creditors' committee, could obtain indemnity for, inter alia, simple negligence. The B.A.P. held that it was not an abuse of discretion for the bankruptcy court to disapprove such expanded indemnity under the circumstances of that case.

14

constrained and overly conservative in their advice, thus disadvantaging the estate.

Though heretofore we have not addressed in depth the reasonableness of indemnifying financial advisors, we have recognized that S 330, which deals with what constitutes "reasonable" compensation for professionals, takes a "market-driven" approach. In re Busy Beaver Bldg. Ctrs., Inc. 19 F.3d 833, 852 (3d Cir. 1994). While this case dealt with the reasonableness of paralegals' compensation, rather than their indemnification, it underscores that some reference to the market is not out of place when considering whether terms of retention are "reasonable" in the bankruptcy context.

Indemnification of financial advisors against their own negligent conduct is becoming a common market occurrence. In re Joan and David Halpern Inc. , 248 B.R. 43, 47 (Bankr. S.D.N.Y. 2000), aff 'd, No. 00-10961 SMB, 2000 WL 1800690 (S.D.N.Y. Apr. 4, 2000)). These provisions are of relatively recent origin, spurred by the In re Merry-Go-Round Enterprises, Inc. settlement of a suit against accountants advising the estate. 244 B.R. 327 (Bankr. D. Md. 2000). Where previously there was no great concern with bankruptcy professionals being sued for negligence, after Merry-Go-Round professionals worried that suits would occur frequently, and they sought to lessen their potential liability by contracting for indemnification. See Joseph A. Guzinski, The United States Trustees: Ongoing Challenges, in 23rd Annual Current Developments in Bankruptcy and Reorganization 251, 274 (PLI Commercial Law and Practice Course, Handbook Series No. 820, 2001) ("In re Merry-Go-Round served as a kind of wake up call for bankruptcy specialists . . . . Fearing exposure to similar claims, specialists . . . have sought indemnification by the company filing the bankruptcy."); Kurt F. Gwynne, Indemnification and Exculpation of Professional Persons in Bankruptcy Cases, 10 ABI L. Rev. 711, 727-29 (2002); Shanon D. Murray, U.S. Trustee Watchdog Starting to Bite, Some Say, N.Y.L.J., May 3, 2001, at 5 (stating that "the current movement of restructuring advisers who want to be indemnified for their bankruptcy work stems from a $4 billion fraud, negligence and malpractice case that a

15

regional trustee brought against Ernst & Young for its role in the bankruptcy proceedings of Merry-Go-Round").

However, that indemnification provisions like Houlihan Lokey's are now common in the marketplace does not automatically make them "reasonable" underS 328.12 Our approach is "market driven," not "market-determined," especially in the realm of bankruptcy, where courts play a special supervisory role. With the understanding and limitations set out below, we believe Houlihan Lokey's indemnification agreement to be reasonable and therefore permissible under S 328. In coming to this conclusion, we revisit traditional negligence/gross negligence analysis, borrowing from Delaware corporate law, and emphasizing that the indemnity provision leaves the door open to examining the level of care financial advisors exercise in the process of obtaining the results, rather than the results themselves. We look to Delaware corporate law as a guide primarily because it offers time-tested insights on how courts should best evaluate an issue similar to the one before us.13 Additionally, Delaware's law often cues the market.

Directors and officers in Delaware may obtain indemnity for their own negligence.14 Section 145(a) of Delaware

---

12. See, e.g., Unsecured Creditors Comm. v. Pelofsky (In re Thermadyne Holdings Corp.), 283 B.R. 749 (B.A.P. 8th Cir. 2002); In re Metricom, Inc., 275 B.R. 364 (Bankr. N.D. Cal. 2002) (rejecting indemnification of Houlihan Lokey, advisor to the bondholders' committee, as unreasonable where the debtor and official committee of unsecured trade creditors retained two other financial advisors without such indemnification agreements, and there was no showing that such an agreement was necessary). Cf. In re Comdisco, Inc., 2002 WL 31109431 (N.D. Ill. Sept. 23, 2002) (reasonableness of indemnity for professional advisors depends on the facts of each case); In re DEC International, Inc., 282 B.R. 423 (W.D. Wis. 2002) (indemnity of bankruptcy professionals not per se unreasonable but must be scrutinized with care).

13. While the retention agreement between United Artists and Houlihan Lokey purports to be governed by New York law, our opinion relates to what is reasonable under S 328(a) of the Bankruptcy Code. As this without doubt is a matter of federal law, we need not examine New York law, and only refer to Delaware corporate law as a useful analogue.

14. Though directors and officers are fiduciaries of the corporations they serve, we do not hold financial advisors like Houlihan Lokey to be

16

General Corporation Law provides that corporations may indemnify directors and officers "if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation." 8 Del. Code S 145(a). Section 145(b) requires that, if the director or officer is adjudged liable to the corporation, he or she will be indemnified "only to the extent that the . . .

court . . . shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the . . . court shall deem proper." Id. S 145(b).

Changes in Delaware's corporate law make plain that S 145(b) requires the "adjudication of liability" to be one of gross, rather than ordinary, negligence.

> Prior to the 1986 amendment to the statute, the language relating to the disqualifying adjudication read 'adjudged to be liable for negligence or misconduct in the performance of his duty to the corporation.' Since Delaware case law has clearly established 'gross negligence' as the standard for liability of directors in violating their duty of care, the reference to 'negligence'

---

fiduciaries. Still, in the bankruptcy context they may owe a higher level of care than in ordinary practice. Compare In re Gillett Holdings, 137 B.R. 452, 458 (Bankr. D. Colo. 1991) ("Investment bankers and financial advisors hired by the Debtor are also fiduciaries."), and In re Allegheny Int'l, Inc., 100 B.R. 244, 246 (Bankr. W.D. Pa. 1989) ("We now hold that the investment bankers/financial advisors hired by the debtor and the Creditors' Committee are also fiduciaries."), with In re Joan and David Halpern Inc., 248 B.R. at 46 (earlier cases rejecting indemnification "overlook the common law principles permitting indemnity of fiduciaries, and the idea that a fiduciary cannot be indemnified for negligence, or that such indemnification is contrary to public policy, is just plain wrong"), In re Mortgage & Realty Trust, 123 B.R. 626, 631 (Bankr. C.D. Cal. 1991) (rejecting indemnification because it is inconsistent with "professionalism," but not holding financial advisors to be fiduciaries), and In re Drexel Burnham Lambert Group, 133 B.R. 13, 27 (Bankr. S.D.N.Y. 1991) (same). The upshot for this case is that, to the extent that fiduciaries may obtain indemnity for their negligence, financial advisors in bankruptcy (who may or may not be fiduciaries) may do the same.

17

> in section 145(b) was inappropriate [and was therefore removed].

E. Norman Veasey et al., Delaware Supports Directors with a Three-Legged Stool of Limited Liability, Indemnification, and Insurance, 42 Bus. Law. 399, 405 (1987); see also Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 364 n.31 (Del. 1993); Smith v. Van Gorkom, 488 A.2d 858, 873 (Del. 1985) (applying a gross negligence standard). In other words, the most that Delaware law requires of directors, though they are fiduciaries, is that they not be grossly negligent. 1 David A. Drexler et al., Delaware Corporation Law and Practice S 15.06[1], at 15-35 (2001) (citing Brehm v. Eisner, 746 A.2d 244, 262 (Del. 2000), and Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)). Put another way, Delaware courts tolerate ordinary negligence from corporate fiduciaries. It is important, however, to understand how these terms are understood in this particular context.

Courts are increasingly recognizing the awkwardness
inherent in using the terms "negligence" and"gross
negligence" in the area of corporate governance. The art of
governing (it is emphatically not a science) is replete with
judgment calls and "bet the company" decisions that in
retrospect may seem visionary or deranged, depending on
the outcome. Corporate directors do not choose between
reasonable (non-negligent) and unreasonable (negligent)
alternatives, but rather face a range of options, each with
its attendant mix of risk and reward. Too coarse a filter, the
traditional negligence construct does not allow these
nuances to emerge.

> While it is often stated that corporate directors and
> officers will be liable for negligence in carrying out their
> corporate duties, all seem agreed that such a
> statement is misleading. Whereas an automobile driver
> who makes a mistake in judgment as to speed or
> distance injuring a pedestrian will likely be called upon
> to respond in damages, a corporate officer who makes
> a mistake in judgment as to economic conditions,
> consumer tastes or production line efficiency will
> rarely, if ever, be found liable for damages suffered by
> the corporation.

18

Joy v. North, 692 F.2d 880, 885 (2d Cir. 1982) (Winter, J.)
(citations omitted).

In simple terms, "[t]he vocabulary of negligence[,] while
often employed . . . [,] is not well-suited to judicial review
of board attentiveness." In re Caremark Int'l Inc. Derivative
Litig., 698 A.2d 959, 967 n.16 (Del. Ch. 1996) (Allen, C.)
(citation omitted). The same principle applies to financial
advisors. In situations where choices are not clear, neither
are gradations of negligence as a means of analysis.

In the last two decades this confusion about what
negligence means led to uncertainty about liability exposure
for both corporate directors and financial advisors. A
"crisis" in corporate governance arose when Delaware
courts began to hold directors personally liable for their
negligence, and directors were unable to find insurance
against the risks associated with their jobs. See 1 Drexler,
supra, S 15.06[1], at 15-36. As already noted, in the
bankruptcy context the In re Merry-Go-Round settlement of
a suit against an accounting firm advising the estate was a
similarly seismic event for financial advisors. Houlihan
Lokey and other financial advisors fear increases in liability
exposure for the risks associated with doing their jobs.15

Delaware courts have resolved the negligence conundrum
in the corporate sphere by evaluating the process by which
boards reach decisions, rather than the final result of those
decisions. A board's failure to inform itself of"all material
information reasonably available" results in a finding of
gross negligence. Aronson, 473 A.2d at 812. 16 In fact,
Delaware's jurisprudence is a direct response to the type of

concerns about second-guessing that Houlihan Lokey
voices:

_____

15. In this respect Houlihan Lokey's position is similar to that of creditor
committee members. See 7 Lawrence P. King, Collier on Bankruptcy
P1103.05[4], at 1103-32-33 (15th ed. rev. 1996) ("If members of the
committee can be sued by persons unhappy with the committee's
performance during the case or unhappy with the outcome of the case,
it will be extremely difficult to find members to serve on an official
committee.").

16. In Merry-Go-Round, claims regarding such a failure by the accounting
firm were at issue.

19

> [C]ompliance with a director's duty of care can never
> appropriately be judicially determined by reference to
> the content of the board decision that leads to a
> corporate loss, apart from consideration of the good
> faith or rationality of the process employed. That is,
> whether a judge or jury [,] considering the matter after
> the fact, believes a decision substantively wrong, or
> degrees of wrong extending through "stupid" to
> "egregious" or "irrational", provides no ground for
> director liability, so long as the court determines that
> the process employed was either rational or employed
> in a good faith effort to advance corporate interests. To
> employ a different rule--one that permitted an
> "objective" evaluation of the decision--would expose
> directors to substantive second guessing by ill-
> equipped judges or juries, which would, in the long-
> run, be injurious to investor interests.

Caremark, 698 A.2d at 967 (emphases in original).

When Houlihan Lokey agreed to advise the Debtors, it
took on the role of a professional (indeed, one highly
respected for its adept counsel in the high-stakes arena of
major restructurings). Its job was to advise the Debtors
well, and it owed them a duty of care in fulfilling this
obligation. To disappoint the reasonable expectations of the
Debtors, their creditors, and indeed the Court, is
unacceptable. At the same time, Houlihan Lokey
convincingly describes the stifling effects of unduly close
scrutiny by the courts. A rule of reason must prevail.

Delaware has navigated the Scylla of condoning directors'
misconduct and the Charybdis of stifling their business
decisions with a rule that stresses not the end result, but
the path taken to reach it. Under this approach, courts do
not interfere with advice by financial advisors when they (1)
have no personal interest,17 (2) have a reasonable
awareness of available information after prudent

_____

17. The Bankruptcy Code itself requires that professionals working for
the estate be disinterested persons, a term defined in 11 U.S.C.

S 101(14). See also 11 U.S.C. S 327(a) ("[T]he trustee . . . may employ . . . persons[ ] that do not hold or represent an interest adverse to the estate, and that are disinterested persons . . . ."); id. S 328(c) (the court may deny compensation if during employment the professional "is not a disinterested person, or represents or holds an interest adverse to the interest of the estate"). While we leave for another day whether, for example, a financial advisor trading in claims with respect to a debtor it serves is disinterested, we note that such a circumstance is not rare.

consideration of alternative options, and (3) provide that advice in good faith. See 1 Drexler, supra, S 15.03, at 15-6. In the corporate sphere this is known as the "business judgment rule." A creature of common law, McMullen v. Beran, 765 A.2d 910, 916 (Del. 2000), it acknowledges a judicial syllogism derived from five fundamental tenets:

> (1) the management of a corporation's affairs is placed by law in the hands of its board of directors;
>
> (2) performance of the directors' management function consists of: (a) decision-making -- i.e., the making of economic choices and the weighing of the potential of risk against the potential of reward, and (b) supervision of officers and employees -- i.e., attentiveness to corporate affairs;
>
> (3) corporate directors are not guarantors of the financial success of their management efforts;
>
> (4) though not guarantors, directors as fiduciaries should be held legally accountable to the corporation and its stockholders when their performance falls short of meeting appropriate standards; and
>
> (5) such culpability occurs when directors breach their fiduciary duty -- that is, when they profit improperly from their positions (i.e., breach the "duty of loyalty") or fail to supervise corporate affairs with the appropriate level of skill (i.e., breach the "duty of care").

1 Drexler, supra, S 15.03, at 15-6.

Here, where a debtor's financial affairs -- the pith of a reorganization -- are shaped by its financial advisors, they lay out the economic choices and assess their risks, and (though not sureties of success) can be held accountable for not advising with the level of care or loyalty expected, transposing the business judgment rule from its corporate ambit to bankruptcy appears well suited. For by this transposition we have a means to distinguish gross from simple negligence, and thus a benchmark for approving as

reasonable an arrangement for indemnity that includes common negligence.18

Our understanding of the developing standards used in this area fortifies our view that the District Court did not abuse its discretion by finding the contested terms in the agreement at issue here to be reasonable. At this initial stage of the indemnity process (considering and approving a retention arrangement containing an agreement to indemnify for ordinary negligence), no evidence before the District Court tended to disqualify Houlihan Lokey under the tenets we set out for determining reasonableness of the indemnity proposed.19

We reach this result with two caveats. The first is that Houlihan Lokey attempted to supplement its retention agreement with a provision in the retention application and approving order that in effect mandates indemnification to Houlihan Lokey for even its gross negligence if that negligence is not judicially determined to be "solely" the

---

18. Houlihan Lokey argues that our approach nonetheless subjects it to claims that it has not followed a correct process in advising debtors. While financial advisors are not Garibaldi for all reorganizations, they are trained to enhance their prospects. Undertaking this duty for so high a recompense ($150,000 per month plus a "transaction fee" of 70 basis points of United Artists' debt) is hardly reasonable if that training is not applied.

19. Before the Court was the affidavit of Michael A. Kramer (Managing Director of Houlihan Lokey), submitted in support of the Debtors' application to retain Houlihan Lokey, and stating that it was "disinterested" (and thus had no personal interest in the United Artists cases), a claim that the U.S. Trustee did not dispute. There was no allegation that Houlihan Lokey imprudently considered financial options available to the Debtors, nor was there any allegation of Houlihan Lokey's bad faith.

In any event, section 328(a) itself provides a safe harbor for the Court to reconsider its approval of any employment terms for professionals.

> Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

22

cause of its damages. In other words, the Debtors would be bound to indemnify Houlihan Lokey when its gross negligence contributed only in part to its damages. This attempted end run goes out of bounds for acceptable public policy. See Gwynne, supra, at 730-01 & nn.106-07.

Secondly, as note 8 supra and the accompanying text indicate, Houlihan Lokey in the Plan sought indemnity only

for actions in its professional capacity. The retention agreement arguably goes further, for it requires indemnification of Houlihan Lokey for contractual disputes with the Debtors. To the extent that Houlihan Lokey seeks indemnity for a contractual dispute in which the Debtors allege the breach of Houlihan Lokey's contractual obligations,[20] this is hardly an indemnity-eligible activity. See Cochran v. Stifel Fin. Corp., No. Civ. A. 17350, 2000 WL 1847676, at *7 (Del. Ch. Dec. 13, 2000), aff 'd in relevant part, rev'd in part on other grounds, 809 A.2d 555 (Del. 2002); cf. Gwynne, supra, at 731. [21]

* * * * *

Financial advisors are an essential part of reorganizations. Our decision today recognizes the need for safeguards from the second-guessing of creditors and, ultimately, the courts. At the same time, it assigns courts their accustomed task of evaluating the process by which advice is given. If financial advisors take the appropriate steps to arrive at a result, the substance of that result

---

20. We doubt that this kind of enhanced indemnity was contemplated by Houlihan Lokey. Subparagraph (a)(iv) of Exhibit A to the retention agreement speaks only of the breach by the Debtors of their contractual covenants, representations, and warranties. While subparagraph (a)(i) relates to any dispute involving the agreement (which theoretically may involve breaches by Houlihan Lokey of its obligations), it appears that such a conceivable argument is overridden by subparagraph (d), which exempts from indemnity "gross negligence, ... willful misfeasance, or reckless disregard [by Houlihan Lokey] of its obligations or duties" under the agreement.

21. As noted supra n.4, the U.S. Trustee has not appealed whether the order permitting indemnification of Houlihan Lokey for its prepetition performance of services to the Debtors is reasonable under S 328(a). We therefore do not address this question.

23

should not be questioned. So understood, agreements to indemnify financial advisors for their negligence are reasonable under S 328(a) of the Bankruptcy Code.[22]

IV. Conclusion

The U.S. Trustee has standing to bring this case. His claim is not constitutionally moot because Plan confirmation has not released all potential claims against Houlihan Lokey. It is not equitably moot because the relief requested will not upset the confirmed Plan. Because it is permissible for financial advisors to obtain indemnity for negligent acts if understood in the context noted above, the contested provision is acceptable. We therefore affirm.

---

22. Our concurring colleague has taken a more familiar path to the same result. That path is plausible and merits consideration. We go

another way because the traditional approach sheds no light on when negligence becomes gross, and thus not indemnifiable. With great conviction, however, we disavow the attempt to blot our judicial escutcheon with the claim that we engage in "policy making" that "goes far beyond the parameters of our judicial function." We address directly the issue on appeal, see supra n.4, and in deciding that issue explain when it is "reasonable" under S 328(a) of the Bankruptcy Code to approve an agreement to indemnify a financial advisor for its own negligence by laying down markers to discern what simple negligence is and is not. As our colleague points out, "the law is unsettled and our bankruptcy and district courts need guidance."

24

ALITO, Circuit Judge, Concurring:

I fully join the thoughtful and scholarly opinion of the court but add a few words in response to Judge Rendell's concurring opinion. With respect, I believe that Judge Rendell's opinion quarrels with an opinion other than the one that the court has issued. The opinion of the court, as I understand it, holds only that the "reasonableness" standard of 11 U.S.C. S 328(a) does not categorically prohibit indemnification of financial advisers, as the United States Trustee argues. If such a blanket prohibition is desirable, it should be enacted by Congress.

Contrary to the suggestion in Judge Rendell's concurrence, the court does not hold that Houlihan Lokey's indemnification agreement must be interpreted in accordance with the principles of Delaware corporate law that the opinion of the court discusses. Nor does the court issue an authoritative interpretation of that agreement. Rather, the court discusses principles of Delaware corporate law because they provide a sophisticated framework for evaluating the conduct of financial advisers and because this understanding of the circumstances in which in it sensible to hold financial advisers responsible for unsuccessful business decisions helps to explain why indemnification agreements such as the one in this case are not categorically "unreasonable."

25

RENDELL, Circuit Judge, Concurring:

I agree with the result reached by the District Court and agree that we should affirm its order. However, I respectfully reject the majority's ruling on the merits, as I read Judge Ambro's opinion, because it represents a significant departure, if not a quantum leap, from the issue before us.

Writing for the panel, brother Ambro does not address what the District Court did or the arguments raised by the parties on this unresolved yet important issue; the opinion actually ignores the issue presented on appeal. The Trustee seeks a per se ban on provisions granting indemnity to

financial advisors for negligence. Houlihan Lokey takes the position that such provisions should be permissible and that the court should examine them on a case-by-case basis. The parties briefed the various aspects of that issue, including the propriety of professionals' obtaining such indemnity and whether it was appropriate or necessary in the given setting. While, as the District Court noted, there is no binding caselaw, there are numerous cases that express differing views on the issue.1

_____

1. In rejecting a per se ban on indemnity provisions, the District Court focused on the "reasonableness" language in section 328(a) and conducted an independent analysis of this agreement. A number of other courts favor this approach and have used it to uphold some indemnity provisions and reject others. For example, the District Court for the Northern District of Illinois and the Bankruptcy Court for the Southern District of New York have both upheld similar indemnity provisions, rejecting the Trustee's argument that such provisions should be per se unreasonable. In re Comdisco, Inc., Nos. 02 C 1174 & 02 C 1397 (consolidated), 2002 U.S. Dist. LEXIS 17994, at *16 (N.D. Ill. Sept. 25, 2002); In re Joan & David Halpern, Inc., 248 B.R. 43, 47 (Bankr. S.D.N.Y 2000). Houlihan Lokey cites to numerous non precedential decisions of the Bankruptcy Courts for the District of Delaware doing the same. A'ee Br. at 22. Bankruptcy Courts in California and Colorado have also subjected indemnity provision to a full reasonableness inquiry. See, e.g., In re Metricom, Inc., 275 B.R. 364, 371 (Bankr. N.D. Cal. 2002) (stating that "the issue is whether particular terms are reasonable under given circumstances, and such a determination can only be made on a case by case basis") (ultimately rejecting provision at issue); In re Gillett Holdings, Inc., 137 B.R. 452, 458-49 (Bankr. D. Colo. 1991) ("This Court will not

26

Instead of addressing these arguments, Judge Ambro's opinion ventures into the arena of corporate law and fashions an open-ended good faith business judgment rule, based upon Delaware corporate law principles, as the test for the "reasonableness" of advisors' indemnity. It does so because it finds the concepts of negligence and gross negligence to be too results-oriented.

I do not doubt that scholars and professors -- and indeed some practitioners -- may have an aversion to distinctions made between negligence and gross negligence and have therefore suggested that corporate directors should not be liable if they follow the appropriate process and exercise their business judgment. However, that is not the issue

_____

go so far as to hold that indemnity provisions per se are either unacceptable or unnecessary in these circumstances. Indemnity provisions must be analyzed on a case-by-case basis.") (citation omitted) (ultimately rejecting provision at issue); In re Mortgage & Realty Trust, 123 B.R. 626, 630 (Bankr. C.D. Cal. 1991) (rejecting provision at issue because debtor had presented no evidence of its reasonableness).

In support of her theory that indemnity provisions should be banned outright, the Trustee relies on an opinion from one of our own

bankruptcy courts, In re Allegheny International, Inc., 100 B.R. 244, 247 (Bankr. W.D. Pa. 1989). In Allegheny, Judge Cosetti decided that financial advisors were fiduciaries of the debtors who hired them. Id. at 246. He went on to appropriate Judge Cardozo's famous remarks in Meinhard v. Salmon, 164 N.E. 545, 546 (N.Y. 1928), for the proposition that fiduciaries owe the highest standard of care, and to conclude that "holding a fiduciary harmless for its own negligence is shockingly inconsistent with the strict standard of conduct for fiduciaries." Allegheny, 100 B.R. at 247. Courts faced with this issue have referenced the "fiduciary" language, but have generally looked at an advisor's fiduciary status as one factor in a reasonableness analysis, not as support for a per se ban on indemnity. See, e.g., Gillett, 137 B.R. at 458; Mortgage & Realty Trust, 123 B.R. at 630.

Here, the parties have not argued that professionals like Houlihan are fiduciaries as such, and I suggest that resort to nomenclature for resolution of the issues before us would be wrong. The issue here is "reasonableness" under section 328(a). An agreement about what status might be attributed to professionals based on analogous corporate trust principles should give way to a consideration of what is reasonable under all of the circumstances in the bankruptcy context.

27

before us, nor is it a concept that either of the parties has even remotely embraced.

Responding to a line of inquiry at oral argument, the Trustee and Houlihan Lokey filed supplemental briefs specifically addressing the propriety of our creating a new "reasonableness" standard separate and apart from the negligence principles embodied in their agreement. They specifically requested that we not do so. 2 As both parties have noted, we should decide the issue presented to us, not craft new rules or address matters beyond the scope of the appeal. I should note that I would favor Judge Alito's reading of Judge Ambro's opinion, but fear it will not be so read.

I cannot help but wonder why we should resort to reasoning that "eschews the inherent imprecision between shades of negligence" when the parties bargained under traditional negligence principles and rules. And why should we concern ourselves with Delaware law applicable to directors, when the retention agreement here was

_____

2. In their Supplemental Briefs, the Trustee and Houlihan Lokey both pointed out the dangers inherent in our creating a new standard in this case. First and foremost, both parties noted that our appellate jurisdiction should be limited to deciding the issue presented, that is, whether the District Court abused its discretion in approving the retention agreement. See App. Supp. Br. at 3 ("The crafting of new negligence standards . . . seems inconsistent with the scope of this appeal.")

The parties also implored us not to venture into the realm of the legislature, as we are not equipped to weigh the many complicated interests that go into bankruptcy administration, nor can we predict the

implications of a new untested standard or the ways it might upset the current balance of incentives. App. Supp. Br. at 6-7; A'ee Supp. Br. at 6. The Trustee worries that the majority's test will essentially excuse all professional misconduct by financial advisors, while for its part, Houlihan Lokey fears the rigid test will undermine its own safeguards, exposing it to "process" litigation by creditors unhappy with their recovery, even where there was no basis on which to attack the substantive advice actually given. App. Supp. Br. at 9; A'ee Supp. Br. at 5. In short, neither party revealed any inclination to support what the majority has done. Rather, both vehemently argued against this approach.

specifically governed by New York law and was meant to govern a relationship not with directors, but between a company and its professional financial advisors? 3 Financial advisors are not directors, and I do not find their status to be analogous.

I must confess that although I would acknowledge that my colleagues sincerely believe that their view represents a contribution to our thinking about the issue at hand, I find it very difficult to conceive of the application, and implications, of this new test. Presumably, the first and third prongs -- "disinterested" and "good faith" -- are easily met, but what does the second prong mean? When does a financial advisor not have "a reasonable awareness of available information after prudent consideration of alternative options"?

In a footnote, Judge Ambro seemingly applies the post-hoc test he espouses (n.19), concluding that the evidence before the District Court revealed no personal interest on the part of Houlihan Lokey in the United Artists  cases, and that, because there were no allegations of imprudent consideration by Houlihan Lokey of the available financial options or of bad faith, Houlihan Lokey is entitled to indemnity. Even were I to agree that the creation of a new test is warranted, surely this is not the way to apply it. This conclusory treatment leaves us uncertain as to how the test should be applied in other instances. I cannot tell whether it will provide a blank check for substandard performance (as the Trustee urges), or will foment process-oriented litigation (as Houlihan Lokey submits). Further, I cannot imagine what guidance we are giving to the District Court by changing the rules midstream, much less what implications this poses for indemnity agreements already in force.

The rationale for adopting this test -- namely, an aversion to a "results-oriented" approach to liability, and therefore, indemnity -- goes far beyond the parameters of

---

3. Although United Artists is a Delaware corporation, its retention agreement with Houlihan Lokey contains an explicit choice of law provision specifying New York law as the governing state law. App. at 132-33.

our judicial function, into the sphere of policy making. To my mind, the adoption of a business judgment rule as providing a standard for indemnification of professional advisors is fraught with policy considerations, none of which has been explored in this case. These are the types of concerns that should be considered in the first instance by a legislative, rather than a judicial, body. Further, the test can only be applied after the fact, thus essentially emasculating the bankruptcy courts' testing of terms of retention at the time of retention, as is clearly envisioned by section 328(a). I fear that our grafting such a test onto section 328(a) goes beyond our ken, especially here where we are reviewing a determination by the District Court that followed traditional lines of reasoning.

The issue actually before us, as framed by the parties and decided by the District Court, deserves our attention. Is there something essentially problematic with the concept of professionals bargaining for indemnity against their own negligence? Should it ever be permitted? If so, under what circumstances? We should address the issue as presented, because the law is unsettled and our bankruptcy and district courts need guidance.

The District Court considered the merits of this issue very seriously and thoroughly, entertaining briefing and oral argument that spans nearly 500 pages of the voluminous appendix submitted on appeal. Instead of creating a new test, I would affirm by disavowing the notion of a per se ban, engaging in a discussion of the factors that the courts have examined in considering "reasonableness" on a case by case basis under section 328, and approving the ultimate result reached by the District Court based on the extensive record presented.4

_____

4. Among the specified factors, and facts, weighing in favor of the reasonableness of this agreement in the situation presented here are: 1) the retention of Houlihan Lokey was in the best  interest of the estate, as it played a crucial role in the restructuring; 2)  United Artists' creditors approved the agreement and have never objected to the indemnity provision; 3) the agreement did not prov ide blanket immunity, but rather contained detailed procedures for determining at a later date whether a particular application for indemnity should be granted;

The review and assessment of the law and the record-- rather than the creation of a slippery slope for testing consulting professionals' liability in the bankruptcy arena -- should be the basis of our rule. The concluding paragraphs of the opinion seem to venture into an analysis of "reasonableness," noting two aspects of the indemnity agreement that are, respectively, an "end run" around "acceptable public policy" (the indemnity for gross

negligence when that negligence is not solely the cause of damages), and not an "indemnity-eligible activity" (the indemnity for contractual disputes with Debtors). These aspects were never argued or briefed, but I suggest that it is this type of scrutiny of the provisions of the retention agreement that is called for under the "reasonableness" standard of section 328(a). I agree that, assessed under the "reasonableness" standard, these two terms do not pass muster. But, unfortunately, we are left confused as to whether the overall inquiry is, as urged in the thrust of the opinion, a post hoc examination, or whether some scrutiny -- on some reasonableness basis -- is to be undertaken at the outset. It is hard to imagine that reasoning done at the outset, if it does occur, could be anything other than a complete and binding determination of "reasonableness," making some after the fact business judgment rule

---

4) Houlihan Lokey had been retained pre-petition u nder an agreement containing an indemnity clause. Most of its work was performed prior to the initiation of bankruptcy proceedings, so, relatively speaking, its post-bankruptcy indemnity was not particularly significant; 5) United Artists and Houlihan Lokey are sophisticated business entities with equal bargaining power who engaged in an arms length negotiation; 6) such terms are viewed as normal business terms in the marketplace, see In re Busy Beaver Bldg. Centers, 19 F.3d 833, 849 (3d Cir. 1994) (condoning a "market-driven" approach to reasonableness); and finally, 7) under the terms of section 328, the District Court retained discretion to modify the agreement "if such terms and conditions prove to have been improvident." 11 U.S.C. S 328(a). Indeed, we have encouraged similar exercises of discretion in the realm of post-bankruptcy fees for attorney services to debtors under 11 U.S.C. S 330. In re Top Grade Sausage, Inc., 227 F.3d 123, 132-33 (3d Cir. 2000). I would therefore approve the indemnity agreement, subject to the two caveats noted by the majority, as discussed in the penultimate paragraph of this concurrence.

31

unnecessary and uncalled for. Once again, we are left questioning how to apply this test.

Therefore, although I concur in the resulting affirmance, I would arrive at that result via an entirely different route.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

32