In re **COMMERCIAL FINANCIAL SERVICES, INC.,** Debtor.

In re **CF/SPC NGU, Inc.,** Debtor.

**Houlihan Lokey Howard & Zukin Capital,** Appellant,

v.

**Unsecured Creditors' Liquidating Trust; ABS Liquidating Trustee; Commercial Financial Services, Inc.; CFS Liquidating Trustee; CF/SPC NGU, Inc.; and United States Trustee,** Appellees.

BAP No. 03–007.
Bankruptcy Nos. 98–05162–R, 98–05166 R.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Aug. 27, 2003.

Richard A. Chesley of Jones, Day, Reavis, and Pogue, Chicago, Illinois (David A. Cheek and Christina E. Murray of McKinney & Stringer, P.C., Oklahoma City, Oklahoma, with him on the brief), for Appellant.

Patrick O'Connor of Moyers, Martin, Santee, Immel, and Tetrick, Tulsa, Oklahoma (Robert S. Glass, Rodney H. Dusinberre and David M. vonHartitzsch, Glass Law Firm, P.C., Tulsa, Oklahoma, with him on the brief), for Appellee Unsecured Creditors' Liquidating Trust.

Katherine Vance, Assistant United States Trustee, Tulsa Oklahoma (Mary E. May, United States Trustee, and Paul R. Thomas, Assistant United States Trustee with her on the brief), for Appellee United States Trustee.

Before CLARK, NUGENT, and THURMAN, Bankruptcy Judges.

## OPINION

THURMAN, Bankruptcy Judge.

Houlihan Lokey Howard & Zukin Capital (Houlihan) appeals an Order of the United States Bankruptcy Court for the Northern District of Oklahoma granting in part and denying in part compensation it requested in a final fee application filed in the Chapter 11 cases of Commercial Financial Services, Inc. (CFS) and CF/SPC NGU, Inc. (collectively, the "Debtors"). The Unsecured Creditors' Liquidating Trust (Trust) and the United States trustee (UST) have filed responsive briefs in this appeal (collectively, the "Appellees").[1] For the reasons set forth below, we AFFIRM.

### I. *Background*

This appeal involves Houlihan's final request for compensation in the Debtors' cases in the amount of $1,920,967.74, which was partially allowed and partially denied. The bankruptcy court awarded Houlihan compensation of $904,000. Houlihan contends that the bankruptcy court erred in disallowing any portion of its requested compensation. Our review of the entire record in this case, necessarily summarized at length below, as well as the applicable law compels us to affirm.

#### 1. *The Debtors' Cases and the Final Fee Order*

On December 11, 1998, CFS filed a Chapter 11 petition. CFS's wholly owned subsidiary, CF/SPC NGU, Inc., filed its Chapter 11 petition on December 14, 1998. The Debtors' complex cases, which were national in scope and involved billions of dollars, were jointly administered by the bankruptcy court. At least two official committees were appointed in the cases— the Official Unsecured Creditors' Committee (Creditors' Committee), and the Official Committee of Asset–Backed Security holders (ABS Committee).

Shortly after the Debtors' cases were filed, the bankruptcy court *sua sponte* entered its "Order Establishing Fee Applica-

---

1. The Trust has moved to supplement the record to include an exhibit that was admitted into evidence by the bankruptcy court. This motion is unopposed, and is GRANTED.

tion Procedure and Fee Guidelines for Professionals" (Fee Order). It stated that, given the size and complexity of the cases, the Fee Order was necessary in part to "inform professionals in advance as to the categories of fees and expenses the Court generally will or will not allow to be paid from the estate so that professionals may make informed decisions in the course of their employment."[2] Toward that end, the court set forth certain "Fee Guidelines," as follows:

> These Fee Guidelines supplement the Bankruptcy Code and Rules, the relevant and binding case law interpreting the Bankruptcy Code and Rules, and the United States Trustee Guidelines, all of which apply in this case.

**Criteria for Evaluating Fee Applications**

The Court will consider the following criteria in evaluating Fee Applications filed in this case:

2. **Hourly Rates.** The primary criterion used to evaluate the reasonableness of the hourly rate charged will be the amount reasonably charged by a person possessing the skill, experience and expertise **required to perform the given task.** As stated in the Fee Application Procedures, **the rate charged for the service shall correspond to the expertise necessary to perform the task, rather than the ordinary rate charged by the person performing it.** The Court will consider the human resources of the firm seeking compensation ... in determining an hourly rate appropriate for a task.

Professionals shall consider this rule when exercising billing judgment in preparation of the billing statement.

3. **Locality.** Professionals ... may charge hourly rates consistent with those charged by a practitioner in the professional's geographic area possessing education, experience, and skills commensurate with the professional ... seeking compensation. Local prevailing rates must be demonstrated by competent evidence at the hearing on the Fee Application.[3]

The bankruptcy court also entered the Fee Order to "establish[ ] an orderly and uniform procedure for professionals" to seek compensation from the Debtors' estates. The Fee Order provides that professionals "shall file interim applications for the allowance and payment of fees and expenses ... every 120 days."[4] Additionally, it states: "All allowances of interim fees and expenses are subject to the Court's review of the same upon submission of a final fee application pursuant to 11 U.S.C. § 330."[5]

*2. The First Retention Application*

In February 1999, after the Fee Order was entered, the ABS Committee filed an application pursuant to § 1103 seeking authorization to employ Houlihan as its financial advisor *nunc pro tunc* to January 4, 1999 (First Retention Application). The First Retention Application was supported by the Affidavit of Michael A. Kramer (Kramer), who then served as Houlihan's Managing Director (Kramer Affidavit). The Kramer Affidavit states:

---

2. Fee Order at 1, *in* Appellant's Appendix at 36 & Trust's Appendix I, Tab 1.

3. *Id.* at 4, *in* Appellant's Appendix at 39 (emphasis in original).

4. *Id.* at 1–2, *in* Appellant's Appendix at 36–37.

5. *Id.* at 2, *in* Appellant's Appendix at 37. Unless otherwise stated, all future statutory references are to title 11 of the United States Code.

Subject to the Court's approval, Houlihan Lokey will charge the Debtors for its financial advisory services a financial advisory fee of $200,000 per month. In addition, Houlihan Lokey will reserve the right to seek, with the consent of the Official ABS Committee and subject to the approval of this Court, a fee in excess of the monthly advisory fee at the conclusion of these cases.[6]

Kramer also disclosed that the Debtors prepaid Houlihan $400,000 prior to filing their petitions (the "Prepaid Fees").[7]

The Creditors' Committee and the UST objected to the First Retention Application, primarily attacking Houlihan's ability be employed due to its receipt of the Prepaid Fees. In addition, CFS responded to the First Retention Application, supporting the ABS Committee's employment of Houlihan, but noting that the Application raised numerous concerns, including whether Houlihan's proposed compensation was reasonable (CFS Response). CFS stated that it was not prepared to take a position as to the reasonableness of the compensation, and requested that this issue be addressed when Houlihan made an application for approval of its fees and expenses.

A hearing on the First Retention Application was held in March 1999. Kramer testified that his firm, and in particular, his group within the firm, focused on financial restructurings, including Chapter 11 cases. When asked by the Creditors' Committee about his understanding of Houlihan's proposed compensation, Kramer stated:

Subject to approval of the Court, we would receive a monthly payment in the amount of $200,000 per month as a payment for services, obviously subject not only to our retention or employment in the matter, *but also to final review by the Bankruptcy Court as to the relative fairness or whatever the exact standard is.*[8]

After this exchange, the bankruptcy court asked Kramer questions about the members of the Houlihan team who would perform services in the Debtors' cases, their experience, and whether they would keep records of the time spent on the case.

At the close of the hearing, all of the parties made closing arguments related to Houlihan's retention. The ABS Committee argued that it should be allowed to retain Houlihan as proposed. CFS, the Creditors' Committee and the UST all stated that they supported the ABS Committee's proposed retention of Houlihan, including the $200,000 monthly fee, but noted that they were reserving objections to the reasonableness of the fee—if the fee was deemed to be unreasonable after services were performed, they would object to it when Houlihan's fee application was filed. All of these parties made clear that the reasonableness of Houlihan's $200,000 monthly fee would be examined based on the amount of time that it spent working for the ABS Committee. A notable example is CFS's closing argument, where its counsel stated: "[W]e trust that Houlihan–Lokey will, in fact, keep time; in part, because I believe that your case administration [Fee Order] required time-

---

**6.** Kramer Affidavit ¶ 5, *in* Appellant's Appendix at 62.

**7.** *Id.* ¶ 6. Kramer later filed a Supplemental Affidavit in support of the First Retention Application, stating that Houlihan is "reimbursed at a stabilized rate of $200,000 per month." Supplemental Kramer Affidavit

¶ 11, *in* Appellant's Appendix at 486. Similar representations were made in a "Proposed Budget" filed by Houlihan.

**8.** Transcript dated March 9, 1999 at 199, *in* Appellant's Appendix at 285 (emphasis added).

keeping." [9] The court interjected: "That's true." [10] CFS's counsel then continued as follows:

> [Timekeeping is required] because it would be impossible for the Debtor or for anyone else, the Court included, ... to come to a reasonable determination as to whether the monthly flat fee payment which is being proposed and to which we currently have no objection, is reasonable, and was provident if we decide to do it today. When we get around to fee petition time, [§ ] 328 does allow the Court to look back. And we don't want to handcuff the Court or any of the parties if the arrangement was not appropriate, in the light of hindsight.[11]

The bankruptcy court did not rule on the First Retention Application immediately after the hearing. Although objections related to the appropriateness of a monthly fee appeared to have been resolved by a universal understanding that the reasonableness of the Houlihan's compensation would be reviewed when it filed a fee application, concerns remained as to whether the Prepaid Fees disqualified Houlihan's employment by the ABS Committee.[12] On June 30, 1999, well before the bankruptcy court approved the First Retention Application, Houlihan's employment by the ABS Committee ended.

### 3. *The First Employment Order*

On October 1, 1999, after issues related to the Prepaid Fees had been resolved, the bankruptcy court entered an Order (First Employment Order) granting the First Retention Application, approving Houli-

han's employment by the ABS Committee for the period of January 4, 1999 through June 30, 1999 (First Engagement). The First Employment Order, entered well after Houlihan's First Engagement by the ABS Committee ended, served to permit Houlihan's compensation to be paid as an administrative expense of the Debtors' estates.

### 4. *The Second Retention Application*

On March 22, 2000, the ABS Committee filed a second application pursuant to § 1103 to employ Houlihan as its financial advisor (Second Retention Application). The Second Retention Application states:

> Subject to the [Fee Order], and subject to the approval of this Court, Houlihan Lokey will charge: (i) a monthly fee of $75,000 plus expenses, beginning the date of the filing of this Application, and (ii) a deferred transaction fee payable upon the successful conclusion of this case. Houlihan Lokey understands and agrees that the allowance and payment of the monthly fees, expenses and the deferred transaction fee are subject to the ultimate approval of this Court. To the extent possible, Houlihan Lokey will maintain records of the services provided and the expenses incurred in connection with this engagement, and will periodically apply for allowance of compensation and reimbursement of expenses in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the [Fee Order]. A proposed Budget will be submitted upon the entry of an Order granting this Application.[13]

9. *Id.* at 230, *in* Appellant's Appendix at 316.

10. *Id.*

11. *Id.*

12. The bankruptcy court held at least one additional hearing on Houlihan's employ-

ment, and Houlihan eventually agreed to disgorge at least $200,000 of the Prepaid Fees.

13. Second Retention Application ¶ 8, *in* Appellant's Appendix at 336. In the Second Retention Application, the ABS Committee recognizes that Houlihan had not filed a fee

The Creditors' Committee responded to the Second Retention Application, supporting the ABS Committee's employment of Houlihan, but again expressing concern about the proposed compensation terms. It stated:

> First, Houlihan Lokey should be required by the Court to keep contemporaneous time records and documentation of its expenses for which reimbursement may be sought. Second, Houlihan Lokey should be compensated only for the reasonable time and expenses actually incurred in performing its services. In other words, Houlihan Lokey should be obligated to comply with all of the applicable legal prerequisites to which all professionals engaged with the Court's approval are bound in establishing that any requested compensation is appropriate.[14]

At the hearing on the Second Retention Application, the ABS Committee, hoping to again secure Houlihan's necessary and undisputedly first-rate services, represented the following about the First Engagement and the terms of the proposed Second Retention Application:

> Under the terms of that original engagement, Houlihan Lokey expressed its agreement with the ABS Committee that it would charge $200,000 per month plus expenses with the expectation that at the conclusion of the case, that it would seek a deferred transaction fee. *Upon the conclusion of the hearing and upon the entry of the order by this Court, Houlihan Lokey's engagement was, in fact, approved with the understanding, however, that notwithstanding the terms of the engagement, that Houlihan, Lokey would have to keep time records ... and that their ultimate com-*

> *pensation ... would be dependent upon the content of that application, the amount of time and the reasonableness of the expenses that were spent.*
>
> . . .
>
> ... They will, in fact, ... keep time records indicating the amount of time that they spend on the case, who does the work on the case and indicate generally the services that were rendered by those persons.
>
> They do understand that they will need to keep records of the expenses ... and that the Houlihan, Lokey firm may, like the rest of us, file a fee application every four months *and will not be paid absent the entry of an order by this Court approving the fees and expenses as reasonable. ...*
>
> . . .
>
> ... [In response to the bankruptcy court's question regarding Houlihan's hourly rates, the ABS Committee stated:] *Your Honor, it's my understanding that the Houlihan, Lokey firm virtually exclusively is engaged on a flat fee monthly basis like we're asking for here. So I can't tell you precisely what ... their hourly rates are. What I can tell you that they're prepared to do is to represent to the Court in their fee applications exactly how much time they spent on the engagement. And we are confident that if you take that, that the amount of time that is spent times an hourly rate that's charged by comparable professionals that you will find that the $75,000 fee that they're going to be asked to be paid is fair and reasonable. I think it's—the only thing I can tell you absent having Mr. Kramer testify— and I believe he would testify as to what*

---

application for the First Engagement, and states that Houlihan was in the process of preparing such an application.

**14.** Creditors' Committee Response ¶ 4, *in* Appellant's Appendix at 343.

*I just said—is that their fees are going to be comparable to what the other professionals are that have been employed by the Unsecured Creditor's Committee.*

*. . .*

*I see that the top hourly rate of those professionals was in the range of $350 per hour, Your Honor. And I will tell you that I anticipate the hourly rates of Houlihan, Lokey would be at least that.*

And that's part of why I think that the $75,000 flat fee gives value the estate because certainly during the initial few months of the case, I am quite confident that the Houlihan, Lokey firm is going to be earning every bit of that $75,000. And I can also tell you, Your Honor, that once the terms of the engagement start slowing down, that I have the assurances of Mr. Kramer that he is going to . . . exercise billing judgment and not charge the bankruptcy estate the $75,000 monthly fee for work that might have been performed in a de minim[i]s fashion in a given month. Frankly, Your Honor, I will tell you that from my own perspective, I believe that Houlihan, Lokey is leaving money on the table in order to accomplish its desire to be paid a flat monthly fee.[15]

The Creditors' Committee again reserved its right to object to the amount of the proposed monthly fee, stating:

Our committee doesn't know whether the $75,000 is the right number or not and frankly, doesn't want to engage this Court or the ABS Committee in a debate about that number. *We simply ask that Houlihan, Lokey be prepared, as every other professional group engaged in this case, to come forward and demonstrate that the services rendered support and demonstrate the $75,000 was the right number at the appropriate time.*[16]

CFS supported Houlihan's employment stating:

[W]e're very confident that we know the procedure that this Court will employ when Houlihan files a fee application and believe that the rules for receiving compensation in this case have been very well set forth in the orders that have been entered by the Court as well as the various fee hearings. . . . *And it appears to me, listening to [ABS Committee counsel] that Houlihan understands those rules and will be playing by those rules, so to speak.*

. . . [ABS Committee counsel] might want to clarify [if] . . . the $75,000 figure is a cap . . . . [or] a rolling cap.[17]

In response to the inquiry of a cap, the ABS Committee represented: "In response to [CFS's] inquiry, it is indeed a rolling cap. In other words, if, over the scope of the four months, there's 90,000 one month, and 60,000 the other month, it will be averaged out over the scope of the four months." [18]

### 5. The Second Employment Order

At the close of the above-described hearing, the bankruptcy court orally approved the Second Retention Application, effective March 22, 2000. In so doing, it allowed the ABS Committee to re-employ Houlihan according to the terms disclosed in the Second Retention Application, including the $75,000 monthly fee. The court stated,

---

**15.** Transcript dated April 4, 2000 at 35, 38–39, 41–43, *in* Appellant's Appendix at 382, 385–86, 388–90 (emphasis added).

**16.** *Id.* at 46, *in* Appellant's Appendix at 393 (emphasis added).

**17.** *Id.* at 48, *in* Appellant's Appendix at 395 (emphasis added).

**18.** *Id.* at 48–49, *in* Appellant's Appendix at 395–96.

in relevant part, that: "The Court will expect that evidence as to the reasonableness of hourly rates will be presented in connection with the presentation of a fee application."[19]

An Order granting the Second Retention Application was entered on April 18, 2000 (Second Employment Order), incorporating by reference the bankruptcy court's bench ruling, and stating: "Houlihan Lokey must keep contemporaneous records of the time spent by it on this engagement ... and [its] entitlement to the allowance of fees and reimbursement of expenses is governed by the [Fee Order]."[20]

### 6. *The Consensual Liquidation Plan*

On September 14, 2001, the bankruptcy court entered an Order in the Debtors' cases confirming a consensual joint plan of liquidation (Consensual Liquidation Plan). As recognized by the bankruptcy court, it is undisputed that Houlihan played an essential role in negotiating the Consensual Liquidation Plan.

The Consensual Liquidating Plan established the Unsecured Creditors Liquidating Trust, defined above as the Appellee "Trust." It gave the Trust the authority to appear and be heard with the same rights, powers, standing and authority as the former Creditors' Committee.

### 7. *The Fee Application*

On October 18, 2001, approximately two years after the entry of the First Employment Order and one and one half years after the entry of the Second Employment Order, Houlihan filed its "First and Final Application for Professional Compensation" (Fee Application), seeking approval of its compensation and reimbursement of expenses pursuant to § 330 for (1) the First Engagement, and (2) for services performed pursuant to the Second Employment Order from March 22, 2000 through July 31, 2001 (Second Engagement). The compensation requested in the Fee Application totaled $1,920,967.74, which was allocated to the First and Second Engagements as follows:

### A. *First Engagement*

The total amount requested for the First Engagement was $1,174,193.55. Houlihan charged $200,000 for each of the six months of the First Engagement, making a slight reduction to its January 1999 fee (because its employment was not approved until the 4th day of that month). The time records connected to the Fee Application show that Houlihan professionals spent 1,915.10 hours on the Debtors' cases during the First Engagement.

### B. *Second Engagement*

The total amount requested for the Second Engagement was $746,774.19. The monthly fee charged for the Second Engagement fluctuated. From March 2000 through September 2000, Houlihan charged $75,000 per month (with a reduction to the March fee to reflect that its employment was not approved until the 22nd day of that month). For October 2000 through December 2000 it charged $50,000 per month, and from January 2001 through May 2001 it charged $25,000 per month. Although Houlihan's employment did not end until July 2001, it did not assert a monthly fee for June or July. The time records connected to the Fee Application show that Houlihan professionals spent 633.70 hours on the Debtors' cases during the Second Engagement.

---

19. *Id.* at 51, *in* Appellant's Appendix at 398.

20. Second Employment Order ¶ 5, *in* Appellant's Appendix at 346.

The Fee Application further disclosed that of the four Houlihan professionals who charged time to the cases only one of the more junior professionals had a graduate-level degree. None of the professionals had more than ten years' professional experience when the First Engagement began.

Approximately one month after it was filed, the Fee Application was supplemented. Houlihan submitted, in relevant part, a summary of compensation paid to other financial advisors in restructuring transactions in the United States. It also acknowledged that its professionals' time records, attached to the Fee Application, were not categorized by project as required by the UST Fee Guidelines, and requested that it be excused from complying with the project-category requirement. Houlihan stated no reason for this motion, other than inconvenience.

### 8. Objections to the Fee Application and Houlihan's Response

The Trust and the UST objected to the Fee Application, as supplemented. Both parties reminded the bankruptcy court that they had not agreed to the amount of Houlihan's compensation inasmuch as they had reserved the right to object to the reasonableness of the compensation sought to be approved in the Fee Application. They requested, in relevant part, that any allowed compensation be substantially reduced to reflect a reasonable compensation. In support of this objection, the Trust claimed that Houlihan's services were no more valuable than those of the Creditors' Committee's financial professionals, and that the highest hourly rate charged by those professionals was $410 per hour. Houlihan's blended hourly rate,

exceeding $700, was therefore unreasonable. In addition, the Trust and the UST argued that the reasonableness of the proposed compensation was difficult to discern, in part, because Houlihan had not organized its professionals' time records by project categories.

Houlihan responded to the objections by again supplementing its Fee Application. It made several concessions related to objections not relevant to this appeal, but it made no reduction to the amount of compensation sought. It also did not categorize its professionals' time records by project category.

### 9. The Disallowance Order

The bankruptcy court held a hearing on the Fee Application, as twice supplemented (collectively the "Fee Application"), and the objections thereto. Houlihan argued that the compensation requested in its Fee Application could not be altered because it was a term of its employment that had been approved under § 328(a).

At the close of the hearing, the bankruptcy court orally granted the Fee Application in part,[21] and denied it in part without prejudice. Relevant to this appeal is that the bankruptcy court denied Houlihan's request for compensation in its entirety, holding that it would not approve the compensation requested until Houlihan's professionals' time records were categorized by project as required under UST Fee Guidelines and the Fee Order. The court, therefore, denied Houlihan's motion to excuse it from categorizing its professionals' time records, and allowed it another opportunity to seek compensation with a properly supported fee application. Reviewing the record related to Houlihan's

---

21. The Fee Application included a request for reimbursement of expenses. This request, as adjusted prior to hearing, was allowed. There are no issues in this appeal related to this portion of the bankruptcy court's Order.

employment, the bankruptcy court also made the following observations:

> Notwithstanding Houlihan Lokey's alleged perception that its retention was approved under Section 328(a), the terms and conditions of its employment were not unconditionally preapproved pursuant to Section 328. There is no legal or factual basis that supports Houlihan Lokey's contention that the proposed monthly fixed fee compensation was approved by this Court. In fact, the ABS Committee second retention application acknowledges that compensation would be, quote: Subject to the ultimate approval of the Court, end quote.

> Accordingly, the Court concludes that all fees and expenses for which allowance is sought by Houlihan Lokey are subject to review under Section 330 of the Bankruptcy Code.[22]

The bankruptcy court concluded that it would "reconsider the application should Houlihan Lokey elect to comply with the guidelines, as previously order[ed] and as requested by the ... Trust and by the [UST]."[23] It instructed that on reconsideration Houlihan would be required "to demonstrate by competent evidence appropriate hourly rates, as required by the guidelines."[24]

Following this oral ruling, the court entered an "Order Allowing in Part and Denying in Part First and Final Application of Houlihan Lokey Howard & Zukin Capital for Professional Compensation" (Disallowance Order). The Disallowance Order incorporates the oral ruling by reference.

### 10. The Amended Fee Application and Objections Thereto

After entry of the Disallowance Order, Houlihan filed another supplement to its Fee Application (the "Amended Fee Application"), breaking its professionals' time sheets into project categories as required under the UST Fee Guidelines, the Fee Order and the Disallowance Order. Houlihan argued that the amount of its allowed compensation should not be tied to an hourly rate. Alternatively, if hourly rates were relevant, Houlihan maintained that its rates were reasonable. It stated: "the seminal determination is the 'reasonableness' of Houlihan Lokey's compensation. [The] uncontradicted evidence [establishes] that its fees in this engagement are comparable to the fees that it, and its competitors obtain in comparable engagements."[25]

The Trust and the UST objected to the Amended Fee Application. Again, the primary basis of both objections was that the total amount of compensation requested by Houlihan was unreasonable in light of the amount of time that it had spent working for the ABS Committee.

### 11. The Final Order

The bankruptcy court conducted a lengthy evidentiary hearing on the Fee Application and the Amended Fee Application (collectively, the "Final Fee Application"). At the close of the hearing, the bankruptcy court took the matter under advisement.

Several months later, the bankruptcy court entered its "Order Approving In Part First and Final Application of Houlihan Lokey Howard & Zukin Capital, Financial Advisor to the Official Committee

---

**22.** Transcript dated March 26, 2002 at 125–26, *in* Appellant's Appendix at 837–38.

**23.** *Id.* at 127, *in* Appellant's Appendix at 839.

**24.** *Id.*

**25.** Third Supplemental Fee Application ¶ 17, *in* Appellant's Appendix at 852.

of Asset–Backed Securityholders, Pursuant to Section 327 and 328 of the Bankruptcy Code and Rule 2016 of the Bankruptcy Rules, for Final Allowance of Compensation for Services Rendered and for Reimbursement of Expenses Incurred From January 4, 1999 Through June 30, 1999 and March 22, 2000 through July 31, 2001" (Final Order). The Final Order awards Houlihan compensation pursuant to § 330 in the amount of $904,000, a little less than one half of the $1,920,967.74 sought. Of the $904,000 awarded, $662,000 is attributed to the First Engagement, and $242,000 is attributed to the Second Engagement.

In awarding Houlihan compensation, the bankruptcy court concluded that: "The services provided by Houlihan Lokey were of the highest quality and were beneficial at the time rendered toward the completion of the case. The services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the issue or task addressed." [26] It also assumed that time spent in the cases, as set forth in Houlihan's time records, accurately reflected its actual and necessary services. The only inquiry made was two-fold: (1) was Houlihan's requested compensation reasonable, and if not, (2) what portion could be awarded as a "reasonable compensation" under § 330(a)(1)(A) and (2).

### A. Houlihan's requested compensation was not reasonable.

Houlihan insisted throughout all of the proceedings related to the Final Fee Application that its monthly fees were reasonable based on the fact that it does not bill on an hourly basis, and that a monthly fee is typical in the marketplace. The bankruptcy court dismissed these arguments, remaining steadfast in its decision, as communicated throughout the Debtors' cases, that the reasonableness of compensation requests would be analyzed under a quantitative test—the monthly fees sought had to be justified based on the hours that each professional worked on the case. The bankruptcy court found that because 1,912.5 hours of services had been rendered during the First Engagement, Houlihan was seeking an "effective hourly rate" of $613.96 for that Engagement. Its total 646.10 hours during the Second Engagement resulted in an effective hourly rate of $1,173.99 for that Engagement. The overall effective hourly rate for both Engagements was $750.79.[27] This hourly rate was then compared to the hourly rates of other financial professionals employed in the Debtors' cases,[28] and blended hourly rates that Houlihan had received in other similar engagements.[29] Based on these compari-

**26.** Final Order at 5, *in* Appellant's Appendix at 998.

**27.** *Id.* at 10, *in* Appellant's Appendix at 1003. The "effective hourly rate" referred to by the bankruptcy court is the amount arrived at by dividing the total amount of hours spent on the Engagement into the total amount requested, without taking into account the qualifications of the various Houlihan professionals who rendered the services.

**28.** The bankruptcy court found that the more senior financial advisor professionals employed by CFS or the Creditors' Committee had, in large part, significantly more years of

experience than the Houlihan professionals and that they billed at hourly rates of between $350 to $410. The hourly rates of less experienced professionals ranged from $120 to $375.

**29.** The bankruptcy court computed an average equivalent blended hourly rate of $356 to $409, using the total hours Houlihan had worked on various cases and the total compensation requested, less any success-based fee. A "blended hourly rate" appears to be the equivalent of an "effective hourly rate" referred to above. *See* note 27 *supra* and accompanying text.

sons, and "[a]fter considering the nature, extent, and the value of the services rendered by Houlihan," the bankruptcy court concluded that the compensation requested by Houlihan had "not been justified and [was] excessive"—*i.e.*, it was not reasonable.[30]

### B. The bankruptcy court's computation of a less, reasonable compensation under § 330(a)(2)

Having determined that Houlihan's requested compensation was not reasonable and, therefore, not allowable under § 330(a)(1)(A), the bankruptcy court analyzed the request for reasonable compensation under § 330(a)(2). It calculated a reasonable compensation of $904,000 by computing an hourly rate for each of the four Houlihan professionals that had billed time to the Debtors' cases, and then applying its hourly rates to the hours that each professional had worked.[31] These hourly rates were based on the hourly rates of CFS or the Creditors' Committee's professionals,[32] and Houlihan's average equivalent hourly rate in other bankruptcy cases.[33] The bankruptcy court assigned these rates, stating that they "are comparable to the high end of rates allowed to other financial consulting professionals in this case." [34]

Houlihan appealed the bankruptcy court's Final Order to this Court. We have jurisdiction over this appeal. Houlihan's Notice of Appeal was timely filed

under Federal Rule of Bankruptcy Procedure 8002(a), the Final Order is a "final" order within the meaning of 28 U.S.C. § 158(a)(1), and all of the parties have consented to this Court's jurisdiction as required under 28 U.S.C. § 158(c) inasmuch as none have elected to have the appeal heard by the United States District Court for the Northern District of Oklahoma.

## II. *Discussion*

It is uncontested that this case is governed by § 330, which provides, in relevant part, as follows:

> (a)(1) After notice to parties in interest and the United States trustee and a hearing, and subject to sections 326, 328, and 329, the court *may* award to a . . . professional person employed under section . . . 1103—
>
> > (A) *reasonable* compensation for actual, necessary services rendered by the . . . professional person . . .
> >
> > . . .
>
> (2) The court *may*, on its own motion or on the motion of the United States Trustee . . . or any other party in interest, award compensation that is less than the amount of compensation that is requested.
>
> (3)(A) In determining the amount of reasonable compensation to be awarded, the court *shall* consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

**30.** Final Order at 11, *in* Appellant's Appendix at 1004.

**31.** The hourly rates assigned to determine the reasonable compensation that it would award were as follows: Mr. Kramer—$400; Mr. Hilty—$390; Ms. Aalto—$300; and Mr. Mooney—$275.

**32.** *See supra* note 28. In so doing, the bankruptcy court expressly noted that the ABS

Committee had stated, when the court had approved the Second Retention Application, that the monthly fee would prove to be reasonable when compared to the professional fees sought by the Creditors' Committee's financial professionals.

**33.** *See supra* note 29.

**34.** Final Order at 11 n. 17, *in* Appellant's Appendix at 1004.

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary ... or beneficial

(D) whether the services were performed within a reasonable amount of time ...; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.[35]

 A bankruptcy court's interpretation of § 330 is reviewed *de novo*,[36] its factual findings related to compensation awards under § 330 are reviewed under a clearly erroneous standard,[37] and its ultimate decision to allow or disallow requested compensation is reviewed for abuse of discretion.[38] The Court of Appeals for the Tenth Circuit has stated as follows:

> Judicial review of the bankruptcy court's factual determinations in connection with a fee award is highly deferential:

>> When we scrutinize factual determinations and discretionary determinations made by a bankruptcy judge, such as may be involved in calculating and fashioning appropriate fee awards, we give considerable deference to the bankruptcy court[.] Historically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters, and in regard to the terms and conditions of the engagement of professionals.... The bankruptcy judge is on the front line, in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails.[39]

Applying these standards, we affirm the bankruptcy court.

 By its plain terms, § 330(a)(1) and (2) gives the bankruptcy court great discretion in awarding professional compensation. But, although given latitude to award (or unilaterally reduce) compensation under § 330(a)(1) and (2), the bankruptcy court must act within the boundaries of that section—that is, it may only allow compensation that is, in relevant part, "reasonable." Accordingly, even if it is undisputed that a professional has provided exceptional services, such as in this case, the bankruptcy court may not award it more than a "reasonable compensation."[40]

 In determining what is a reasonable compensation, § 330(a)(3) *man-*

---

**35.** 11 U.S.C. § 330(a)(1)(A) & (2)-(3) (emphasis added). The inclusion of two subsection (A)s in § 330(a)(3) is not made in error. This is how the statute was drafted when it was amended under the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, 108 Stat. 4106 (1994). The first "(A)" appears to have been erroneously included by the drafters, and it is not used in the citations that follow.

**36.** *In re Lederman Enters., Inc.*, 997 F.2d 1321, 1323 (10th Cir.1993); *In re Miller*, 288 B.R. 879, 881 (10th Cir. BAP 2003); *In re Abraham*, 221 B.R. 782, 783 & n. 1 (10th Cir. BAP 1998).

**37.** *Lederman Enters.*, 997 F.2d at 1323; *Abraham*, 221 B.R. at 783 & n. 1; *see* Fed. R. Bankr.P. 8013.

**38.** *In re Miniscribe Corp.*, 309 F.3d 1234, 1244 (10th Cir.2002); *Lederman Enters.*, 997 F.2d at 1323; *Miller*, 288 B.R. at 881; *Abraham*, 221 B.R. at 783 & n. 1.

**39.** *Miniscribe*, 309 F.3d at 1244 (quoting *Casco N. Bank, N.A. v. DN Assoc. (In re DN Assoc.)*, 3 F.3d 512, 515 (1st Cir.1993)(quotation omitted)) (although decided under the pre 1994 version of § 330, the discretionary standard applied is the same).

**40.** 11 U.S.C. § 330(a)(1)(A). Of course, while, as discussed below, there exist objec-

*dates* that the bankruptcy court consider the nature of the services, the extent of the services, and the value of the services, taking into account "all relevant factors." [41] While a reasonableness inquiry is mandatory, the factors to be taken into account in determining reasonableness are within the discretion of the bankruptcy court, which is best positioned to determine what is "relevant" in any given case. Section 330(a)(3) includes a nonexclusive list of factors that a court may (or may not) consider.[42] In addition, the Tenth Circuit has stated that in deciding the reasonableness of professional fees, either under § 330 or outside of bankruptcy, the lodestar analysis set forth in *Johnson v. Georgia Highway Express, Inc.*[43] may be relevant.[44]

Our review of the record and the applicable law convinces us that the bankruptcy court did not err in its determination that only § 330(a) applied and its interpretation of § 330(a), its findings of fact were not clearly erroneous, and it did not abuse its discretion in refusing to award Houlihan all of the compensation that it requested. Accordingly, we must affirm the Final Order. Our reasoning is explained below, followed by an analysis of Houlihan's arguments.

 The bankruptcy court correctly applied a two-step analysis under § 330. It first determined the reasonableness of Houlihan's requested compensation as it is required to do under § 330(a)(1) and (3). In so doing, it expressly considered, as it is compelled to do under 330(a)(3), the nature, extent and the value of Houlihan's services. Furthermore, it took into account the factors that it deemed relevant to determine reasonableness (the same

---

tive criteria for determining "reasonableness," ultimately this standard is subjective in nature. Thus, bankruptcy courts may, in their discretion, consider the "value" of a professional's services and, as done by the bankruptcy court in this case, award compensation at the high end of the reasonable spectrum to reward an exceptional job.

Some courts have awarded enhancement fees, success fees, or bonuses in rare and exceptional cases. Although Houlihan's First and Second Retention Applications made reference to a success-based fee, the allowance of such a fee is not at issue herein. In the Final Order, the bankruptcy court stated that it had determined in relation to another professional employed in the Debtors' cases that this was "not one of those rare and exceptional cases that supports a success fee." Final Order at 6 n. 8, *in* Appellant's Appendix at 999. Houlihan did not seek a success-based fee in its Final Fee Application.

41. *Id.* § 330(a)(3).

42. *See* 11 U.S.C. §§ 102(3) (" 'including' [is] not limiting") & 330(a)(3) (in determining the reasonableness of compensation the bankruptcy should take "into account all relevant

factors, including" those listed in subsections (A)-(E)); *see also Miller*, 288 B.R. at 882 (recognizing that the list of factors stated in § 330(a)(3)(A)-(E) is not an exclusive list).

43. 488 F.2d 714 (5th Cir.1974).

44. *Miniscribe Corp.*, 309 F.3d at 1243–44 (interpreting what is reasonable under § 330(a), prior to its amendment in 1994, the Tenth Circuit stated: "This court has long applied the *Johnson* lodestar factors to assess 'reasonableness' of attorney's fees in a variety of contexts ... and has also specifically determined that the test applies to attorney fee determinations under § 330(a)(1).")(citing *Lederman Enters.*, 997 F.2d at 1323 (citing *First Nat'l Bank v. Niccum (In re Permian Anchor Servs., Inc.)*, 649 F.2d 763, 768 (10th Cir.1981) ("This court in another context has held that reasonable attorneys' fees are to be based upon an evidentiary inquiry which meets generally the guidelines set forth in the case of *Johnson*. ... The rationale of these cases ought to apply to a determination of reasonable attorneys' fees in a bankruptcy proceeding that involves construing contracts and notes which expressly call for the award of reasonable attorneys' fees."))).

ones that it consistently informed the parties it would apply)—the time spent on the services and the rates charged. These factors are specifically enumerated in § 330(a)(3)(A) and (B) as factors that a bankruptcy court may consider, and are part of the *Johnson* lodestar factors. Accordingly, we cannot conclude that their application was an abuse of discretion. Furthermore, after taking into account these factors, the bankruptcy court's ultimate conclusion that Houlihan's requested compensation was not reasonable was not an abuse of discretion.

Once it determined that Houlihan's requested compensation could not be awarded because it was not reasonable, the bankruptcy correctly set out to award a lesser, and reasonable compensation under § 330(a)(2). It concluded that a reasonable compensation was $904,000. Its methodology to arrive at this award was not an abuse of discretion.

Specifically, the court, acting well within its discretion, calculated an hourly rate for each Houlihan professional as a means to determine a "reasonable" compensation. The hourly rates ultimately calculated and applied by the court were appropriately influenced by the hourly rates of other professionals employed in the case,[45] the education, skill and experience of the Houlihan professionals who billed time, and the average equivalent blended hourly rates that Houlihan had received in other engagements. These hourly rates, being set at the highest or higher end of approved hourly rates in the case, recognized the undisputed value Houlihan's services added to the estate, and rewarded Houlihan for a job well done. In conclusion, the bankruptcy court did not err in refusing to award Houlihan the compensation requested in its Final Fee Application, or in awarding it a lesser, reasonable compensation of $904,000.

Houlihan raises five points of error on appeal. For the reasons stated below, we find them not persuasive.

Houlihan first claims that the bankruptcy court erred as a matter of law because § 330 does not require compensation to be based solely on an hourly rates. If the bankruptcy court stated this proposition, we would agree with Houlihan that it is incorrect.[46] But, the bankruptcy court

---

**45.** Houlihan maintains that this comparison was inappropriate because it was the only investment banking firm in the case, and the evidence showed that its services were different than those of the other financial professionals. We would give this argument more weight on a different record. But, as recognized by the bankruptcy court, counsel for the ABS Committee, in seeking approval of the Second Retention Application and, in particular, the monthly fee applied for therein, represented as follows:

> [W]e are confident that if you take … the amount of time that is spent [by Houlihan professionals] times an hourly rate that's charged by comparable professionals that you will find that the $75,000 fee that they're going to be asked to be paid is fair and reasonable…. I believe [that Mr. Kramer] would testify as to what I just said- is that their fees are going to be comparable

to what the other professionals are that have been employed by the Unsecured Creditor's Committee.

Transcript dated April 4, 2000 at 42, *in* Appellant's Appendix at 389 (quoted at note 15 *supra*). Accordingly, the bankruptcy court cannot now be faulted for using the rates of the other financial professionals as a point of comparison to evaluate the reasonableness of Houlihan's monthly fees.

**46.** There is no requirement anywhere in the Bankruptcy Code requiring an hourly rate compensation. In fact, § 328(a) indicates that a professional may be employed "on any reasonable terms and conditions …, *including* on a retainer, on an hourly basis, or on a contingent fee basis[,]" and presumably, on a monthly fee basis. 11 U.S.C. § 328(a) (emphasis added); *see supra* note 42.

did not so hold. Rather, it approved Houlihan's employment, based on the terms proposed—including the monthly fee arrangement, knowing that under §§ 328(a) and 330(a) it was not bound by the ABS Committee's retention agreements with Houlihan. When Houlihan sought allowance of its monthly fee compensation, the bankruptcy court correctly conducted an independent evaluation of its reasonableness as it is required to do under § 330(a), and only awarded that portion of the requested compensation determined to be reasonable. An hourly rate analysis was not mandated by the bankruptcy court, but rather was used by it as a means to (1) evaluate whether the requested monthly fee-based compensation was reasonable, and finding that it was not, to (2) determine a lesser, reasonable compensation as permitted under § 330(a)(2). This was, for reasons already discussed, entirely appropriate under § 330(a).

Houlihan next maintains that the evidence is undisputed that it was seeking market compensation of a fixed monthly fee and, therefore, the bankruptcy court erred in refusing to make its award on that basis. While it *is* undisputed that Houlihan was seeking market compensation in the form of a monthly fee, this argument fails for two reasons.

■ First, it ignores the bankruptcy court's independent duty under § 330(a)(3) to consider "the nature, the extent, and the value" of Houlihan's services, the fact that it has discretion to consider what factors are relevant in carrying out that duty, and that it has discretion to award or not to award compensation. Houlihan's demand that it be compensated on a monthly basis does not govern the bankruptcy court. As

stated in *In re Geneva Steel Co.*,[47] although a professional may be employed pursuant to a market-based fixed fee, "such an appointment is by no means a guarantee that the fees will be awarded in that fashion. The trial court may reject a fee contract in favor of the lodestar approach."[48]

■ Second, the fact that a monthly fee is used in the marketplace, while relevant to a reasonableness inquiry, does not dictate how the court determines reasonableness under § 330(a). Related to this point is that a typical method of compensation in any given market does not make the amount sought reasonable. As the Court of Appeals for the Third Circuit has stated in the context of evaluating the reasonableness of employment terms under § 328: "[T]hat ... provisions like Houlihan Lokey's are now common in the marketplace does not automatically make them 'reasonable'.... Our approach is 'market driven,' not 'market-determined,' especially in the realm of bankruptcy, where courts play a special supervisory role."[49] Again, the use of a monthly fee in the marketplace may be a relevant factor in determining its reasonableness, but it does not preclude the bankruptcy court from independently evaluating the reasonableness of the fee, taking into account factors that it determines, in its discretion, to be relevant.

Related to the previous point of error, is Houlihan's third claim that the bankruptcy court must award a monthly fee because that is the type of fee used in the marketplace by investment bankers. In making this argument, Houlihan relies on early legislative history to § 330, incorporated into § 330 under subsection (a)(3)(E), indicating Congress' intent to insure the quali-

**47.** 258 B.R. 799, 801 (Bankr.D.Utah 2001).

**48.** *Id.* (citing *Beck v. Northern Natural Gas Co.*, 170 F.3d 1018 (10th Cir.1999)).

**49.** *In re United Artists Theatre Co.*, 315 F.3d 217, 230 (3rd Cir.2003) (footnote omitted).

ty of bankruptcy services by allowing bankruptcy professionals compensation comparable to that of nonbankruptcy professionals. While Houlihan's argument is well supported, this point of error fails because, as held by the bankruptcy court, Houlihan did not produce any evidence to support it. Houlihan has not pointed us to the place in the record to refute the bankruptcy court's finding,[50] and we conclude that it is not clearly erroneous. Even if evidence had been presented, however, we note that this is just one factor of many that the bankruptcy court could consider in determining reasonableness under § 330(a)(3).[51]

■ Underlying all of Houlihan's arguments is its fourth point of error that somehow it was unfairly treated in the Debtors' cases—that it was ambushed in some way. While unfairness is suggested in conjunction with most of Houlihan's claims, it is fully fleshed out as follows:

> [T]he bankruptcy court erred in choosing to apply to Houlihan Lokey a wholly different standard of compensation that [sic] which it applied for, which the Court had approved and which all parties-in-interest had received notice of. In making this determination after Houlihan Lokey had concluded from its services in these cases, the Bankruptcy Court's Order violated all notions of fundamental fairness and equity that underlie the Bankruptcy Code.[52]

As we stated at oral argument, this is a very serious charge, and our exhaustive review of the record reveals that it is wholly unsupported. As shown above, the Fee Order, the bankruptcy court's questions and comments at the hearing on the First Retention Application, its bench ruling on the Second Retention Application, the Second Employment Order, its bench ruling on the Fee Application and its resulting Disallowance Order, all put Houlihan on sufficient notice that although its approved engagement by the ABS Committee was based on a monthly fee, the court would evaluate the reasonableness of that fee when a fee application was filed. And, notably, that a reasonableness inquiry would take into account the time Houlihan spent on the Debtors' cases as reflected in required time records.

Not only was Houlihan on notice of the criteria that the court would use, but, contrary to Houlihan's contentions, CFS, the Creditors' Committee and the UST all made clear during the hearings on the First and Second Retention Applications and in their responses or objections to those Applications that when Houlihan filed a fee application they would use the amount of time that Houlihan actually spent on the Debtors' cases, as reflected in its time records, to evaluate whether the amount of the proposed monthly fees was reasonable.

Furthermore, the ABS Committee, Houlihan's client, was cognizant that the

**50.** Houlihan admits that it did not present such evidence, stating: "As the Bankruptcy Court well knew, neither Houlihan Lokey nor its competitors charge on an hourly basis, and thus non-bankruptcy evidence on effective hourly rates does not exist." Appellant's Brief at 32 n. 8. This does not address the issue herein, that Houlihan failed to meet its burden to prove its entitlement to its monthly fees by producing evidence of "comparable compensation" of nonbankruptcy investment

bankers. It introduced no evidence of nonbankruptcy professional compensation, hourly rate or otherwise, and thus it cannot fault the bankruptcy court for failing to consider what it did not have before it.

**51.** *Miller,* 288 B.R. at 882 (recognizing that bankruptcy courts are not required to address every subsection of § 330(a)(3)).

**52.** Appellant's Brief at 26.

ultimate allowance of the monthly fees included in its employment agreements with Houlihan would need to be justified by the time that Houlihan spent on the case. In seeking Houlihan's re-employment, it stated it was understood that time records would be kept for the First and Second Engagements and that "their ultimate compensation ... would be dependant upon ... the amount of time [spent]." [53] As noted above, the ABS Committee also represented that when the total hours spent on the cases were considered in conjunction with the monthly fee, the fee would be reasonable when compared with the hourly rates of other professionals in the case.

Finally, and importantly, Houlihan's claim of unfair treatment is not convincing because Houlihan *admitted* at all relevant stages of the cases an understanding that its monthly fees would be subject to the bankruptcy court's "final review." [54] Given the bankruptcy court's insistence on Houlihan's maintenance of hourly time records at the inception of the case, and Houlihan's express agreement in its Second Retention Application to keep such records, it should not have come as a surprise to Houlihan that the "final review" would compare the amount that it was requesting with the amount of time that its professionals spent

on the Debtors' cases. It also bears mentioning that Houlihan, an established professional participant in bankruptcy cases, must have been aware of the bankruptcy court's duty under § 330(a) to allow only "reasonable compensation," and that reasonableness may be evaluated by looking at the amount of compensation requested and the time spent on the cases. [55]

In conjunction with Houlihan's fairness argument, we observe that Houlihan prejudiced itself by failing to file any fee applications in the Debtors' cases until well after its Second Engagement had ended. Had it timely filed interim fee applications as ordered under the Fee Order, [56] it most likely would have confirmed prior to the Second Engagement that although it could demand a monthly fee, the reasonableness of that fee would be determined by a time and rate analysis. As stated by the Creditors' Committee in response to a similar "lack of notice" argument made by Houlihan below: "Houlihan's election to defer this determination [regarding an award of compensation] to the end of the Bankruptcy Case should not inure to Houlihan's benefit in any way." [57]

Houlihan's fifth and final point of error is that the bankruptcy court erred in its calculation of the hourly rates for each of its four processionals. [58] We have already

---

**53.** Transcript dated April 4, 2000 at 35, *in* Appellant's Appendix at 382 (quoted *supra* at text accompanying note 15).

**54.** Transcript dated March 9, 1999 at 199, *in* Appellant's Appendix at 285 (quoted *supra* at text accompanying note 8).

**55.** *See, e.g., In re Circle K Corp.*, 294 B.R. 111 (Bankr.D.Ariz.2003); *In re UDC Homes, Inc.*, 203 B.R. 218 (Bankr.D.Del.1996) (this requirement is discussed and applied to Houlihan's compensation requests made in each case).

**56.** Houlihan could have filed a fee application for its First Engagement as early as October 1, 1999, when the First Employment Order

was entered. Under the Fee Order, Houlihan should have filed a fee application for the Second Engagement every 120 days after the Second Employment Order was entered.

**57.** Trust Objection ¶ 5, *in* Appellant's Appendix at 575.

**58.** Houlihan appears to argue that the bankruptcy court should have applied the average blended rate of $751 to the hours spent by all of the Houlihan professionals. It claims that such a rate was reasonable because it is 44% less than the average of its comparable engagements. The bankruptcy court did not err in refusing to apply this blended rate which, *inter alia,* does not account for the varying

held that the bankruptcy court did not abuse its discretion by assigning hourly rates to each of the Houlihan professionals to determine a lesser, reasonable compensation under § 330(a)(2). Furthermore, this argument is not persuasive because the findings of fact related to the assigned rates are not clearly erroneous. They are supported by record, and after reviewing all of the evidence, we are not "left with a definite and firm conviction that a mistake has been made."[59]

### III. *Conclusion*

For the reasons stated herein, the bankruptcy court is AFFIRMED.

---

levels of skill and experience of the various Houlihan professionals who rendered services to the ABS Committee.

**59.** *Manning v. United States,* 146 F.3d 808, 812 (10th Cir.1998) (quotation omitted); *accord Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).